### KELLY et al. v. STATE OF GEORGIA et al.

(District Court, S. D. Georgia, W. D. May 30, 1895.)

1. HABEAS CORPUS—KILLING BY DEPUTY MARSHAL MAKING ARREST.
   Sections 753–761 of the Revised Statutes, controlling the writ of habeas corpus considered and applied for the protection of deputy marshals, who necessarily killed, while attempting to arrest, a party indicted for conspiracy and murder.

2. SAME.
   In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, discussed and followed.

3. SAME.
   The dissenting opinion of the chief justice and associate justice in that case does not controvert the right to habeas corpus when the act involved is done in pursuance of a law of the United States or an order of a court of the United States.

4. SAME—ARREST BY STATE AUTHORITIES—JURISDICTION OF FEDERAL COURTS.
   When deputy marshals of the United States are attempting to execute a warrant of arrest of parties charged with conspiracy and murder, where the offense is indictable under the laws of the United States, and are met with such violent resistance as compels them to take the life of the party resisting, either in their own self-defense, or for the purpose of executing the warrant, and the deputies, as a consequence, are arrested for murder by the state authorities, the courts of the United States have jurisdiction to issue the writ of habeas corpus, and, on the return, to summarily hear the evidence, and dispose of the accusation against the officers, as law and justice may require.

5. SAME.
   This is true, notwithstanding there is no provision of law for trial by jury in the enactments of congress providing for the writ of habeas corpus and the procedure thereunder.

6. UNITED STATES MARSHALS—WHEN JUSTIFIED IN KILLING—PROTECTION BY FEDERAL COURTS.
   Where a party defendant to a bill in equity in the United States court refuses to respect the subpoena, writ of injunction, or attachments issued appropriately by said court, and, when arrested under attachment, violently resists with deadly weapons the arresting officers; is rescued by a mob of his friends; takes the life of an employé of the party in whose favor the injunction issued, while said employé is working on lands in controversy; is indicted for this murder; leaves his home; dwells habitually in the woods and swamps, and with his two sons, all habitually armed with deadly weapons, sends messages of defiance and disrespect to the officers of the law, and that he will kill them if an effort is made to arrest him; and, when finally summoned to surrender by the arresting officer, opens fire with a magazine rifle on the officer making the summons, and a duel ensues, in which several shots are exchanged and the accused is finally killed,—the killing is justifiable, the officer has committed no offense whatever, and is entitled to and will receive the protection of the United States courts against any prosecution brought against him elsewhere for alleged offenses growing out of the performance of his duty in pursuance of the laws of the United States and the orders of the court.

7. SAME—HABEAS CORPUS—SUPREMACY OF FEDERAL LAWS.
   The laws of the United States (sections 753–761, Rev. St., inclusive), providing for the issuance, trial, and disposition of proceedings by habeas corpus, are the supreme law of the land. They extend to every foot of its soil, and, under the circumstances described above, are controlling, as expressive of the sovereignty of the United States, in a matter within the bounds of its jurisdiction. A judgment of acquittal by the courts of the United States thereunder will, as to the issues involved, protect the relators from prosecution or molestation elsewhere.

William T. Gary, U. S. Atty., and Marion Erwin, for relators.
Thomas Eason, Sol. Gen., and J. W. Preston, for respondents.

SPEER, District Judge (orally). I regret that anything has been said in the argument of this case which tends to take it out of the category of ordinary judicial investigation. It is in that view that the court considers it. It is true that, pending the trial, there has been some bitterness of publication, with regard to the action of the court in granting the writ, and some bitterness of denunciation of the officers, but in the main the cause has been treated fairly by the press, and if it has been treated unfairly in any particular, it will be no more proper to hold fair journalism responsible than it would be to hold the good people of Telfair county responsible for the character and conduct of such a man as the evidence demonstrates Lucius Williams to have been. I am here to obey the law of my country. That commands the issuance of the writ of habeas corpus, when applied for by any person who is in custody "for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court or a judge thereof." That is announced in section 753 of the Revised Statutes, and is an epitome of the law upon the subject, from the 24th day of September, 1789, down to a very recent date. When the writ is issued, the duty of the judge is marked out with equal clearness. "The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments and thereupon to dispose of the party as law and justice require." Section 761, Rev. St.

Now, that is the law; and it is not only law, but it is the paramount law. Not only is it declared to be paramount law by the constitution of the United States, which of course every intelligent mind concedes is controlling upon the action of the court, but it is the law as stated in the initial paragraph of that admirable codification, the Code of Georgia. Section 1 declares: The laws of general operation of this state are "as the supreme law, the constitution of the United States, the laws of the United States in pursuance thereof, and all treaties made under the authority of the United States." In subordination to this supreme law are the laws of the state of Georgia, first as expressed by its constitution, and then as expressed by its statutory enactments not in conflict with its constitution. It appears, then, unquestionably, that I am acting in obedience to law. Well, am I acting in accordance with the formal procedure of the law? There is no doubt about that. The decisions of the supreme court, from an early period in the history of our country, and a multitude of decisions of the circuit and district courts of the United States, have approved and sanctioned the precise proceeding we have before us. These questions have been already passed upon and decided here in a ruling on the plea to the jurisdiction and demurrer interposed in the progress of the case, and therefore it is not necessary to state them more elaborately at this time. I will, however, call the attention of counsel to the fact that the authority of the United States is not re-

stricted, as they supposed, to dockyards, arsenals, and the like, but the sovereignty of this nation extends to every foot of its soil.    This has been so repeatedly and so lucidly stated by the courts of highest authority that the informed lawyer can no longer doubt it. In the case of Ex parte Siebold, 100 U. S. 371, Justice Bradley, in rendering the opinion of the court, declares:

"Here, again, we are met with the theory that the government of the United States does not rest upon the soil and territory of the country. We think that this theory is founded on an entire misconception of the nature and powers of that government. We hold it to be an incontrovertible principle that the government of the United States, by means of physical force, exercised through its official agents, executes on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent. This power to enforce its laws, and to execute its functions in all places, does not derogate from the power of the state to execute its laws at the same time and in the same places. The one does not exclude the other, except where both cannot be executed at the same time. In that case the words of the constitution itself show which is to yield: 'This constitution and all laws which shall be made in pursuance thereof shall be the supreme law of the land.' Without the concurrent sovereignty referred to, the national government would be nothing but an advisory government. Its executive power would be absolutely nullified. Why do we have marshals at all if they cannot physically lay their hands on persons and things in the performance of their proper duties? What functions can they perform if they cannot use force? In executing the processes of the courts, must they call on the nearest constable for protection? Must they rely on him to use the requisite compulsion, and keep the peace, whilst they are soliciting and entreating the parties and bystanders to allow the law to take its course? This is the necessary consequence of the positions that are assumed. If we indulge in such impracticable views as these, and keep on refining and refining, we shall drive the national government out of the United States, and relegate it to the District of Columbia, or, perhaps, to some foreign soil. We shall bring it back to a condition of greater helplessness than of the old confederation. It must execute its powers, or it is no government. It must execute them on the land as well as on the sea, on things as well as on persons. And, to do this, it must necessarily have power to command obedience, preserve order, and keep the peace, and no person or power in this land has the right to resist or question its authority so long as it keeps within the bounds of its jurisdiction."

That case is expressly approved by the court in the last case upon the subject (In re Neagle, reported in 135 U. S. 1, 10 Sup. Ct. 658), and in summing up the argument in that case, Justice Miller, for the court, said:

"It would seem as if the argument might close here. If the duty of the United States to protect its officers from violence, even to death, in discharge of the duties which its laws impose upon them, be established, and congress has made the habeas corpus one of the means by which this provision is made efficient, and if the facts of this case show that the prisoner was acting both under the law and the direction of his superior officers of the department of justice, we can see no reason why this writ should not be made to serve its purpose for the present case."

Nor is there, as stated by counsel for the state, any dissent from this conclusion, even by those judges who are supposed by some to take a more limited and literal view of the power vested in the United States by the constitution, and to attach more importance to the sovereignty of the states than do other judges who are more disposed to treat the implied powers of the constitution as operative

and effective. In the Case of Neagle, Justice Lamar and Chief Justice Fuller use this language in their dissenting opinion,—language which indicates that these eminent jurists do not dissent from any question which affects the rights of these prisoners at the bar:

"Many of the propositions advanced on the behalf of the appellee, and urged with impressive force, we do not challenge. We do not question, for instance, the soundness of the elaborate discussion of the history of the offices and functions of the writ of habeas corpus, and its operation under section 753 of the Revised Statutes (which I have just read), or the propriety of its use in the manner and for the purposes for which it has been used in any case where the prisoner is under arrest for an act done in pursuance of the laws of the United States."

Can it be denied that, prima facie, these relators have acted in pursuance of a law of the United States? Here are accusations for murder, presented before a commissioner, and for other crimes against national authority. Here is an indictment of the grand jury of this court charging the same offenses. The warrants were intrusted to these relators. They are officers of the executive department of the government. Not only do the constituted authorities of the land charge that the laws of the United States have been violated by the men whom these deputies were trying to arrest, but the laws of the United States directed the deputies to make the arrest, and therefore they acted in "pursuance of the laws of the United States."

"Nor do we contend," continues Justice Lamar, "that any objection arises to such use of the writ, and based merely on that fact, in cases where no provision is made by the federal law for the trial and conviction of the accused."

And that is the refutation of the proposition, pressed by counsel for the state here, that there is now no opportunity for trial by jury of the accused, that this proceeding is subversive of the rights of the state. The law is that the right of trial by jury is not the right of the government, but is the right of the accused. The constitution of the United States declares that "the accused shall enjoy the right to a speedy and public trial by an impartial jury." Amendment 6. It, then, is not the right of the government, either of the state or of the United States, to insist that in all criminal cases there shall be a trial by jury. It is the right of the accused, and they have not demanded it. This precise question, also, was passed on by the supreme court of the United States in the case I hold in my hand (In re Neagle), approving the language of Judge Kane (in Ex parte Jenkins, 2 Wall. Jr. 543, Fed. Cas. No. 7,259):

"It has been urged," said that judge, "that my order, if it shall withdraw the relators from the prosecution pending against them in the state court, will prevent their trial by jury at all. It will not be an anomaly, however, if the action of this court shall interfere with the trial of these prisoners by a jury. Our constitution secures that mode of trial as a right to the accused, but they nowhere recognize it as a right of the government, either state or federal."

The relators, then, were acting in pursuance of a law of the United States when they went to execute the warrants of arrest on Lucius Williams and his sons. They were, moreover, acting in obedience to the order of this court, issued appropriately, and expressed by its warrants. They claim that, in obedience to law and

the order of this court, they were forced to kill this man, who was charged with the highest crime known to the law. Will the country permit the doors of its courts to be shut in their faces when they say that they properly acted in obedience to its laws and the order of its court? Are they not entitled to a hearing here? If they are so entitled, the court has jurisdiction to hear and to proceed, in obedience to the law as expressed in section 761 of the Revised Statutes, to do with these men as "law and justice require." Now, what do law and justice require?

This case is the culmination of a tremendous litigation, imposing for more than ten years tremendous responsibility and tremendous anxiety upon this court, resulting from the fact that years ago the late William E. Dodge bought large bodies of land in this state, about which his children have been compelled to appeal to the courts for protection. These lands were conveyed by him to his son, George E. Dodge, and by George E. Dodge to Norman W. Dodge. All of this appears from the record before the court. These were residents of the state of New York. A number of persons, residents of the state of Georgia, were charged with numerous acts of fraud and forgery and violence, with the purpose to deprive these nonresidents of the benefits of their investments in this state. The case had been brought before I had the honor of presiding in this court, and was pending when I entered upon the performance of my judicial duties. It was tried. The trial lasted through many days. It was thoroughly and ably argued and fully considered. A final decree was rendered sustaining the title of Mr. Dodge to every foot of this land. Dodge v. Briggs, 27 Fed. 160. No appeal was taken from the decision of the court. It was, therefore, final. The decree itself, in the further progress of litigation with other parties, was carried before the supreme court of the state of Georgia, and that court added its high sanction to the decision of this court, and held that the decree perfected the title of Norman W. Dodge in the land described in the decree and order of the court and in his evidence of title. The decree itself enjoined the defendants to that bill from interfering with the lands of Mr. Dodge. For a time the decree was obeyed. But finally a gigantic system of forgery of deeds, and a fraudulent seizure of the land with the attempt to establish prescriptive titles, was begun. This was done at the instigation of and by Luther A. Hall, a party to the original case before this court, and who had been expressly enjoined. The matter was brought to the attention of the court, and, in a trial lasting many days, the character of this man's conduct was investigated. The court found him guilty and sentenced him, for contempt of the decree, to five months' imprisonment in Chatham county jail. While in that jail, as it appeared from the evidence in the trial which ensued, he concocted a conspiracy for the murder of a most amiable, excellent, and valuable citizen, John C. Forsyth, the agent of Norman W. Dodge, who had been conducting the litigation. The conspiracy, as the bill of indictment charged and the jury found, was to prevent and hinder Mr. Dodge from exercising the right to pursue his remedies in the United States courts. The case is fully reported in U. S. v. Lancaster

(two reports), 44 Fed. 885–932. A number of persons took part in that conspiracy. Forsyth was murdered under circumstances of the most heinous, pathetic, and pitiable character. At his quiet, happy home, in the bosom of his devoted family, with his wife and children around him, after the evening meal, his brains were blown out by the hand of a hired assassin, who fired through the window, and it appears in the testimony in this case at bar that the man Lucius Williams contributed $200 to the payment of the assassins. A number of conspirators were brought before the court. They were convicted and sentenced to various terms of imprisonment in the Ohio state penitentiary, most of them for life. One of these men was Luther A. Hall, who, in success at the bar, and ability, and learning, particularly on the subject of ejectment, was somewhat notable. Another was Wright Lancaster, the sheriff of the very county in which this homicide was committed about which this inquiry is pending. Lucius Williams was not charged in that indictment with connection with the conspiracy, but it appeared on the trial of that case that he had forged a number of the deeds which were used for the purpose of attacking the title of Mr. Dodge, in violation of the injunction of the court, and the court, in its summation of the evidence to the jury, referred to that fact, and some of the forged deeds taken from the record of that trial were introduced here.

Several years elapsed. The title of Mr. Dodge in the same lands was, it is alleged, assailed by other parties. He filed a bill of peace against some three or four hundred defendants, alleging circumstances of trespass and wrong which he now insists claim the attention of the court for his relief. In that case not one single contested question has yet been decided. It is pending before the court. Lucius Williams was a party defendant to that bill, and, when the officers went to serve him with the original writ of subpoena, he refused to accept service and informed the officer, in violent and truculent language, that he had no respect for the court and did not intend to accept service or obey its orders. Rule day came,—the day on which he should have filed his answer. He made no appearance. In the orderly progress of the case, judgment pro confesso, that is to say, judgment by default, was taken against him. No injunction had been granted when the bill was originally filed. After service of subpoena upon him, he then proceeded, as the court was advised by the sworn petition of the plaintiff, ran off his hands, cut trees across his tramway, and otherwise threatened violence to his agents and employés. But, even then, so careful was the court to give him every right to which he was entitled that only a rule nisi was issued against him to appear and show cause why he should not be enjoined from committing acts of violence or trespass pending the final determination of the suit. When the young deputy went to serve the rule he was met with a string of profanity which the court will not repeat in this presence. The deputy was told, if he ever attempted to serve any papers from this court upon him, his life would be taken, and that if any officer of the court came there to arrest him or his sons it would be a question of who could shoot

v.68F.no.6—42

first as to who should live. Acts of violence were again committed, which were brought to the attention of the court by affidavits, and the court this time issued an attachment for the arrest of Williams, together with a rule nisi to show cause why he should not be punished for contempt. Two of the most conservative and cool-headed officers of the court were sent last fall to effect the arrest under the attachment. At a moment when Lucius Williams had laid aside his Winchester, the officers rushed upon him and arrested him, and slipped a handcuff on one of his wrists, and then ensued a scene of violence, struggle, and resistance, and a display of indescribable profanity and utter disregard of his own life on the part of this man, which the evidence in this case has disclosed, and which has never been, I presume, exceeded on any occasion of like character. Williams finally got out his knife, and although the officer held his pistol to his breast and told him he would kill him if he attempted to cut, the prisoner did not cease for one moment in his efforts to stab the officer, who finally by a quick blow of the pistol struck the knife from Williams' hands. The officer was John A. Kelly, one of the relators. But runners had been sent out by Williams' friends. They gathered in sympathy with this desperate man. The brave and considerate officers proceeded a short distance with their prisoners, when they were surrounded by an armed mob, with Winchesters, double-barreled shotguns, and pistols leveled at them from every side; they were compelled to surrender their prisoners or lose their own lives. The officers, then, by cool and brave discretion, and by a stratagem, evaded the mob, and reported the facts to the court. The attorney general sent a large force to arrest the parties who had rescued Williams, but after the most strenuous efforts, owing to the remote and difficult country, and the impossibility of identification, the attempt failed. Only one man, a son-in-law of Lucius Williams, was identified and convicted. The injunction was yet of force with regard to this land. A short time thereafter, Mr. Dodge employed laborers to proceed with cutting his timber. Two or three men came to the land where the hands were at work, and one of them shot a poor, innocent negro to death,—a negro whose only offense was that he was standing on a log cutting, at the obedience of a man who had employed him. He was shot through the body and died next day. Lucius Williams, in cruel and merciless language, boasted of the deed as his. The grand jury of this court, composed of men of high character, returned an indictment against Lucius Williams and his two sons for that offense. So notable had become this case that the attorney general—the head of the law department of the government—issued a reward for the arrest of these parties, and other rewards were added by parties to the case. The officers, however, in the absence of such reward, had not ceased their efforts to accomplish the arrest. But finally one of the prisoners at the bar, John A. Kelly, went to the neighborhood and remained there a long time,—26 days, with but a short intermission. Lucius Williams and his sons were lurking in the woods. They were frequently seen armed to the teeth with shotguns, Winchester rifles, and a large revolver. They had their retreat in the depths of Ocmul-

gee swamp. Lucius Williams made open declaration that if the officers attempted to arrest him, he would kill them. This was brought to the attention of Kelly, in command of the deputies, three in all, but that officer did not cease in his effort to perform his duty. On the day of the homicide he was, with three deputies, watching the house of one of the defendants in the murder case, a son of Lucius Williams, and he saw the three men, armed as usual, approach the house. He determined to make the arrest, and in the effort the life of Lucius Williams was taken, and upon that act the issue now before the court is formed.

The court need say no more with regard to the criminal and lawless character of Lucius Williams, except that it appeared from the records in his own county that, in 1889, he was indicted by a grand jury thereof for the offense of forgery of a deed or deeds relating to the title of these lands, or some of them; that the case has not been tried to the present time. A copy of the indictment is before the court. A witness testified that he was an habitual forger,—that he had known him to be engaged in forging for 18 years. His method was to send off for suitable paper, write the spurious deeds himself, usually have them attested by a witness and then by one of his sons-in-law, two of whom had successively been justice of the peace, and then by tobacco, coffee, and other appliances to "age" them, and give them a color which would indicate that they were ancient documents. One of these deeds was offered in evidence. It was attested by the witness who testified to the facts, and officially attested by the son-in-law of Lucius Williams, a magistrate, and is now in evidence before the court, with other deeds of a similar character.

Previously, in the same expedition, a special effort was made to arrest this man. The same officers made their way in the night through miles of the dense and overflowed Ocmulgee swamp. They found his camp on an island, his tent, blankets, and canoe. He was absent. They crossed to the forest and watched his trail, on which he must return. He came, discovered them, ran, was pursued, and fired on. He returned the fire, and made his escape. These officers of the court then knew it was a life and death matter to arrest this desperado. Deputy Kelly testified that they carefully approached the house from the position of concealment in which they had been, and, sending around two of his assistants to the left of the house, he took his position near a small cotton or buggy house, as it is indifferently called, on the other side of the road, and in a diagonal direction, about 40 yards from the house in which Lucius Williams was. I may say in passing that the two men who volunteered to go as deputies to arrest this man were his nephews, and it appears otherwise in the evidence that, because one of them had sworn to an affidavit intended to support the title of Mr. Dodge, and to assist him in the litigation in this case, Lucius Williams, on two occasions, with great difficulty, was prevented from taking the life of one or both of them. On one occasion he had left the house of witness Wells at daybreak, and, when discovered, had concealed himself in a corner of the worm fence, had drawn the grass over him, and, armed with a Winches-

ter rifle, was waiting for his victim to come along the road on which the young man was compelled to pass. At another time, at the witness' house, he was present when the sons of Lucius Williams were compelled to throw themselves upon their father and by violence prevent him from murdering, with his rifle, one or both of these nephews, who were coming over the hill in the direction of the house. All this goes to show the desperate character of the man whom these officers were proceeding to arrest. The testimony of Mr. Kelly, given in a manner in which the court does not hesitate to say would carry conviction of its truthfulness to any mind not engaged to discredit it, or not otherwise biased, was that he walked to the corner of the cotton house, that the dwelling was to the right, that Lucius Williams and one of his sons were lying on the veranda. It was immediately after dinner,—according to the testimony of the wife of John Williams, 15 minutes after dinner. These parties, Williams and his son, had eaten dinner, and had gone out on the veranda,—were lying down there. This had taken place while Kelly's assistants were making their way from the point of their concealment to the left of the dwelling. Kelly testifies that he had taken his position, and stationed Garrison at the other corner of the cotton house, where he had a range with his rifle on the door of the house. Garrison was armed with a Winchester rifle, Kelly with a 10-gauge, double-barreled, breech-loading shotgun, loaded with 20 buckshot to the barrel. He stated that he called loudly: "Mr. Williams, Gentlemen, get up from there and surrender." "Mr. Williams, I am here to arrest you. You know who I am. Get up and surrender." He stated that Williams looked over the railing, and then arose with his gun in his hands. Kelly said to him: "Put down that gun, Mr. Williams. I will not hurt you. Surrender." At that time a girl rushed to the door. Holding his gun with his right hand, the deputy waved the girl back in the house. "Get back; get off the porch," he exclaimed. She ran back. At that instant he said Williams was approaching the door with his gun presented. Williams threw his gun to his shoulder and fired. Kelly returned the fire, and he thought he saw the result of the fire. He testified that the shots were simultaneous. Williams disappeared in the house. In the rail in the fence, within a foot or two of where Kelly stood, was the mark of a rifle ball, which might have been 44-caliber, breaking through one rail, knocking out a piece of the rail, going through a soft rail, and cutting down a stalk of corn behind. On the front of the house, all about where Kelly's testimony placed Williams, as high as his head, were the marks of Kelly's buckshot. John M. Williams was on the porch, according to the testimony of Kelly, and ran into the house on his "all fours." The deputy had a warrant to arrest John M. Williams, as he and Lucius Williams were both indicted for murder. He could have killed him, but would not do it because he was not armed, and was making an effort to escape. Firing then began on the left-hand side of the house. John M. Williams was in the house, indicted for murder and armed, or with the capacity of being armed, for the weapons he had borne for

months were there in the house. Lucius L. Williams, according to the testimony, was in the house. Another was in there, a man of the name of Grace. Steve Williams was in the house. A shotgun, two rifles, and a heavy revolver were in there. The house was encompassed on two sides by officers, the firing continued. Kelly states he saw somebody come to a window on the left-hand side of the door with a shotgun in his hands. He fired at it and, to use his own expression, he heard a "lumbering" of the gun as it fell. A Winchester rifle is put in evidence, with a buckshot in the stock, and the window panes were found shattered, and a shot in the widow sill. The buckshot striking the rifle must have knocked the gun from the hand of the person holding it. Hearing the firing continue on the left of the house, thinking perhaps his men needed help, Kelly stated that he climbed a ladder, which was at the rear of the buggy house, and attempted to look over it at the surrounding country to see how the battle progressed. The ladder did not reach quite to the top of the house. By standing on the top round of the ladder, and holding to the gable end of the house, he could look over it. He left his gun at the foot of the ladder and carried only a pistol with him. He came down from the ladder, and, as he attained the ground and proceeded to take up his gun, a shot came from the left of the veranda of the house in front, —to the right as he stood. Kelly said, in his testimony, "That shot nearly killed me." He returned the fire and missed Lucius Williams, who had fired. The buckshot from Kelly's gun was found in the corner post of the veranda and in the banisters next to it. He then states that he saw Lucius Williams creeping back toward the chimney and loading his gun. Presently this desperate man again came forward, screening himself as much as possible by the banisters. Kelly could see his feet. He could not fire through the banisters, because he said he did not have a shot to throw away. He knew it was a battle to the death. According to the testimony of this witness, Williams came stealthily to the corner, and attempted to draw a bead on his intended victim, the officer of the law. In order to do so, being a right-handed man, he was compelled to throw his left side toward where Kelly stood. The corner upright post of the veranda made this necessary. Williams fired one shot and missed. He worked the lever of his rifle, and was again taking aim. Kelly states that he took deliberate aim at him and fired. Williams fell backward, and his gun went off in the air. Kelly saw him no more until a few minutes afterwards, when he was lying in a pool of blood at the back of the house.

The court has attentively considered the evidence, anxiously and carefully, and, except a doubtful opinion of a physician as to the course of a shot, which may or may not have been deflected by some bone or integument of the body, there is not a syllable of evidence in the case that contradicts Kelly on any material point. Take, for instance, the testimony of Grace. Kelly did not see him on the front porch, and therefore testified he was not there, but in the excitement he might not have seen him, and perjury should not, therefore, be imputed to Kelly. He testified that he was lying there

asleep. He did not know whether Lucius Williams was asleep or not. He did not know whether he went to sleep before Lucius Williams did, or whether Lucius Williams, if he did go to sleep at all, went to sleep before he did, but the fluid from a quid of tobacco in his mouth, as he slept, choked him, and he awaked, to use his own expression, "to spit out of the veranda." At that moment, with his back towards Lucius Williams, who, he testified, had been lying very near him,—as I remember the testimony, within two feet of him. He heard some one say "Lady, get off the porch," and immediately heard a shot. This he said was from the corner of the cotton house. He then said he could not tell where it came from. When asked, he said it seemed in front of him. He did not know whether there was a shot behind him or not. He did not see Lucius Williams any more on the porch at the time. Considerably alarmed for his own safety, he testified that he ran into the house, and ran to the other end of the hall, and, standing there, he looked back, and then saw Lucius Williams standing in the front doorway in a shooting position, directing his gun towards the cotton house. There is no conflict there. Might it not have been true that both men fired at the same time? Kelly so testifies. This man Grace testified that he did not know what awakened him. Might it not be true that the call of Kelly to surrender awakened him, and not the quid of tobacco? Can a man who is sleeping tell with certainty, when several causes might have awakened him, what was the actual cause? Lucius Williams was behind him, and must have had his gun, for the witness Grace afterwards saw him in the doorway with his gun.

What other conflict is there with that witness? None whatever. The young lady, Miss Vickery, testified that she went to the door. She did not hear anybody out there. She said all three men were asleep when she came to the door. It may be remarked that there must have been something very soporific about that dinner that all three should be asleep in 15 minutes after they had left the table. This young woman testifies she was sent for a book. She did not go for the book, but for some reason, she doesn't know what, she went to the front door and looked out. Is it not natural to suppose she heard Kelly calling on Williams to surrender, although she thinks not? Why should she, sent for one thing, go to the door and look out? She elsewhere stated that she did not know whether the Williamses were asleep or not. She heard an expression from Kelly, "Go back lady; go back," and she ran into the hall as quick as she could go, and then she heard a shot. Can it be that Kelly shot Williams lying on the floor, and shot him in the face, according to the contention of counsel for the state? It was four feet from the door to the window, and this young woman was standing in the middle of the door. Williams was lying against the window, with his feet towards the door of the veranda, and his head must have been eight feet, at least, from Miss Vickery, and, according to the testimony of Cameron, he was in full view of a man 35 or 40 yards away from where Kelly stood. Why should this desperate murderer, Kelly, have found it necessary to warn this young lady if he

had intended to shoot the sleeping man? Indeed, would not the outcry have defeated his purpose by awakening his victim? He had no such purpose. Williams was approaching the door. This might have been after Miss Vickery ran in, for Kelly, like a brave man, although in deadly danger of Williams' rifle, was careful to warn the young woman. Miss Vickery did not hear him say anything except the warning to her, and Mrs. Williams, who was in the dining room at the rear of the house, did not hear him say anything. He swears positively that he did call to Lucius Williams, and awakened him, and that afterwards the shooting began. This is positive, and there is nothing to contradict it. They all testify that when Williams came through the house there was a wound on his face. All testify that Williams came into the door through the house with his gun in his hand. According to the testimony of the doctor, the wound in his face ranged upward and backward. Kelly was on the ground down a gradual slant. Williams was on the veranda, according to the testimony of Kelly, with his gun in a shooting position. The shot struck him while in a standing position, and would necessarily have ranged upward and backward. And it does not need that he should have been in a lying position to have received the wound. According to the testimony of the doctor there were three other wounds, any one of which was mortal. They were on the left side, one in front, one on the side, and one on the back. The physician testified that, in his opinion, the wound on the back could not have been received when Williams was firing from the corner of the veranda at Kelly. That is a conclusion; in that the court differs with him. But he testifies that it could not have been made while Williams was lying down on the porch. And he testifies, also, that the other wounds might have been received while Williams was at the corner of the veranda firing in that position, and all three wounds were mortal. But, suppose Kelly fired at this desperate man as he ran into the house. He would be then acting strictly in conformity to the law. This was not a duel under the Code. Nor was it an occasion of military punctilio, like that where the commander of the household troops of France exclaimed, "Gentlemen of the English guard, fire first." Here are officers of the law, with warrants charging these prisoners with murder. They could not stand back. Their duty was to go forward, and to take these men, but at the same time they were not obliged to forego necessary precaution to save their own lives.

The testimony of Miss Vickery, instead of contradicting Kelly, confirms what he said. The wounds in Williams' body confirm what he said. The blood stains on Williams' rifle confirm the testimony of the officer. The testimony of all the witnesses is that the first two shots, which the learned counsel state were received in Williams' face, did not stop him. Then even this man might have made his escape through the back door of the house, across the fields to the woods. That was not his purpose. He was like an Apache Indian driven to his last stand. He determined to die right there, as he had declared time and again he would do, or to kill Kelly, instead of fleeing, as he might have done, and as Grace did.

He stealthily stepped around to the left-hand side of the house, with the magazine of his rifle loaded with cartridges, to take advantage of Kelly when he was off his guard, and put him to death if he could by his skill as a marksman. Then he met his death as a result of his resistance to the law. There was never a case in which an officer was necessarily in greater danger, or who, in a case where such conduct was obligatory, acted with a more cool and conservative regard for the law and for his duty. I might go on with the other witnesses. It is not necessary. So certain and clear is the mind of the court with regard to the innocence of these men, so certain am I that they did nothing but that which the law commanded them to do, that I will not longer discuss it. The other officers who were with him were deputies. They are under the same protection as himself, and with three desperate men outlawing themselves, armed to the teeth, who had resisted and evaded the law for months, men for whom the government of the United States had offered rewards in order to secure their arrest, the officers were entitled to treat that house as a fortress, and to fire upon it to keep down the fire of the parties inside, and thus effect the arrests which it was their bounden duty to do. The testimony of the shots confirm this. Not one shot was there which would justify the conclusion that Williams was fired upon while on the floor. The testimony of Cameron places the nearest shot to the floor in the window sill as $13\frac{1}{4}$ inches, and the buckshot scattered from there up. He did not know whether they reached the top of the house or not. And as Williams sprang to the door and fired his shot, pausing for a moment when Kelly fired, there were seven buckshot right where Williams was stated to be. There were two in his face, and others scattered around. Why, then, is there any reason to send these men for their trial for murder into the county where this homicide was necessarily committed by the officers of the law? The court sees none. The law commands us to protect the officers of the court in the discharge of their duty. The proceeding is effective. It is regular. The hearing has been full and ample. The parties charged are not guilty of the offense of murder, or any other offense. They have proceeded with due discretion and caution in the performance of their duty, and in the exercise of the power intrusted to me by the laws of my country to dispose of these parties as law and justice may require, I order their discharge and also direct that, in the order, it be recited that they shall not be further interfered with by any one for the same alleged offense.