Ex parte CALDWELL.

(Circuit Court, N. D. West Virginia. June 13, 1905.)

1. HABEAS CORPUS—FEDERAL CONSTITUTION—CONSTRUCTION.

Const. U. S. art. 1, § 9, providing that the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it, is not a grant of power to the federal courts, but a prohibition against its suspension by Congress or the executive.

2. SAME—EXTENT OF POWER.

Under Rev. St. U. S. §§ 716, 751, 752, 753 [U. S. Comp. St. 1901, pp. 580, 592], authorizing federal courts to issue the writ of habeas corpus, the power of such courts to issue such writs is co-extensive with the common-law power, provided only that the writ shall not be issued for the deliverance of a prisoner in jail, except in cases specified.

[Ed. Note.—For cases in point, see vol. 25, Cent. Dig. Habeas Corpus, §§ 38–45.

Jurisdiction of federal courts in habeas corpus cases, see note to In re Huse, 25 C. C. A. 4.]

3. SAME—SCOPE OF WRIT.

A writ of habeas corpus may be issued out of the federal courts to inquire into the cause of a commitment under a civil as well as a criminal process.

[Ed. Note.—For cases in point, see vol. 25, Cent. Dig. Habeas Corpus, § 38.]

4. SAME—STATE LEGISLATURE—DEPARTMENTS OF GOVERNMENT—CONDUCT OF EXECUTIVE—LEGISLATIVE COMMITTEE—EXAMINATION.

Const. W. Va. art. 5, provides that the legislative, executive, and judicial departments shall be separate and distinct, so that neither shall exercise the power properly belonging to either of the others, nor shall any person exercise the powers of more than one of them at the same time. Article 4, § 9, provides for the impeachment of state officers by the House of Delegates and trial by the Senate; that judgment in case of impeachment shall not extend further than the removal from office and disqualification to hold any office of honor, trust, or profit under the state; and that the Senate may sit during the recess of the Legislature for trial of impeachments. *Held*, that the House of Delegates had no power to appoint a committee to sit during vacation to investigate al-

leged misconduct of the Governor, in pursuance of a special message submitted by him solely for the purpose of vindicating the Governor, whose term would expire before he could be tried or impeached.

5. SAME—WITNESSES.

The House of Delegates of West Virginia having no power to appoint a legislative committee to investigate during vacation the alleged misconduct of the Governor, for which he could not be impeached because of the approaching expiration of his term of office, such committee had no power to incarcerate a witness for refusing to obey its subpœna.

Reese Blizzard and Chas. T. Caldwell, for petitioner.
Chilton, MacCorkle & Chilton, for respondent.

DAYTON, District Judge.   Article 1, § 9, of the Constitution of the United States provides that "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." This provision is not a grant of power to the federal courts, but a prohibition against its suspension by Congress or the executive. The right existing in federal courts to issue the writ is purely a statutory one conferred by sections 716, 751, 752, and 753 of the Revised Statutes [U. S. Comp. St. 1901, pp. 580, 592].

Section 751:  "The Supreme Court and the Circuit and District Courts shall have power to issue writs of habeas corpus."

Section 752:  "The several justices and judges of the said courts within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty."

Section 753:  "The writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof, or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof, or is in custody in violation of the Constitution or of a law or treaty of the United States," etc.

It will thus be seen that the power of federal courts to issue this writ is coextensive with the common-law power, provided only that it be not used for deliverance of a prisoner in jail, except in the cases specified. This federal jurisdiction, when assumed, is paramount. These sections of the Revised Statutes authorizing the issuance of the writ are the supreme law of the land, and a judgment of acquittal thereunder by the federal courts will protect the relator from molestation or prosecution elsewhere. Kelly v. State of Georgia (D. C.) 68 Fed. 652.

The writ may issue to inquire into the cause of commitment under a civil process as well as a criminal one.   Ex parte Randolph, Fed. Cas. No. 11,558.

Chief Justice Waite, in Ex parte Tom Tong, 108 U. S. 556, 2 Sup. Ct. 871, 27 L. Ed. 826, says:

"The writ of habeas corpus is the remedy which the law gives for the enforcement of the civil right of personal liberty. Resort to it sometimes becomes necessary because of what is done to enforce laws for punishment of crime; but the judicial proceeding under it is not to inquire into the criminal act which is complained of, but into the right of liberty notwithstanding the act. Proceedings to enforce civil rights are civil proceedings, and proceedings for the punishment of crimes are criminal proceedings."

The exercise of this power by federal courts to release citizens from unlawful restraint imposed by inferior federal tribunals or authority is accompanied with no embarrassment or difficulty. It seems to us such exercise is not only a right, but a duty, always bearing in mind that the writ shall in no case be allowed to become a substitute for a writ of error or appeal. Its plain and simple scope in such cases is to restore to his liberty a person held under void authority. Mr. Black, in his exhaustive note to In re Huse, 79 Fed. 305, 25 C. C. A. 1, has well said:

"A writ of habeas corpus cannot be used as a substitute for an appeal or a writ of error. It cannot be made the means of procuring in a higher court a review of the judgment of a lower court in respect to alleged errors, either of law or fact, or mere irregularities, occurring in the course of a criminal trial. Since it is in the nature of a collateral attack upon the judgment, the inquiry is limited to the question whether the trial court has acted without jurisdiction, or has exceeded its jurisdiction, so as to render the sentence void"—citing numerous authorities.

The exercise of this power in behalf of federal officers prosecuted illegally by state courts has also become a well-determined one, having been exercised to the fullest limit in the famous case of In re Neagle, 39 Fed. 833, 5 L. R. A. 78, and Id., 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, where a United States marshal being tried by a state court for homicide, committed in defense of the life and person of a justice of the Supreme Court, was released.

The power of federal courts to release by habeas corpus a person held in state custody contrary to federal Constitution or laws is unquestioned, but the exercise of this power is accompanied with very great embarrassment, and should be so exercised with sound discretion and great caution. In re Huse, 79 Fed. 305, 25 C. C. A. 1; In re Jordon (D. C.) 49 Fed. 238; Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868; Ex parte Fonda, 117 U. S. 516, 6 Sup. Ct. 848, 29 L. Ed. 994; Cook v. Hart, 146 U. S. 183, 13 Sup. Ct. 40, 36 L. Ed. 934. In this latter case Mr. Justice Brown says:

"Where a person is in custody under process from a state court of original jurisdiction for an alleged offense against the laws of that state, and it is claimed that he is restrained of his liberty in violation of the Constitution of the United States, the Circuit Court of the United States has a discretion whether it will discharge him in advance of his trial in the court in which he is indicted, although this discretion will be subordinated to any special circumstances requiring immediate action. While the federal courts have the power and may discharge the accused in advance of his trial, if he is restrained of his liberty in violation of the federal Constitution or laws, they are not bound to exercise such power, even after a state court has finally acted upon the case, but may, in their discretion, require the accused to sue out his writ of error from the highest court of the state, or even from the Supreme Court of the United States."

See, also, New York v. Eno, 155 U. S. 89, 15 Sup. Ct. 30, 39 L. Ed. 80; In re Chapman, 156 U. S. 211, 15 Sup. Ct. 331, 39 L. Ed. 401; Whitten v. Tomlinson, 160 U. S. 231, 16 Sup. Ct. 297, 40 L. Ed. 406.

The reasons why federal courts should exercise this power with caution and only in extraordinary cases, where it affects the control of the state courts, are clear and cogent. They spring from the peculiar relations existing between the two authorities, from the

mutual comity and forbearance which ought to exist between them, and to avoid all strife and conflict that may arise on account of their concurrent jurisdiction, having the same purpose and duty to perform—that to administer justice "agreeable to the usage and principles of law."

Under these principles and limitations, we come therefore at once in this case to the first important question—whether the facts are of such character as to warrant, in its sound discretion, the intervention of this court. Briefly stated, here is a citizen of the United States, resident within the jurisdiction of this court, who says that he is deprived of his liberty, not by "due process of law," not by any court of competent jurisdiction, state or federal, but by a pretended writ of attachment and arrest issued by another citizen claiming to be chairman of a committee, constituted by a single house of the legislative branch of the state, sitting without power or authority, after the power of such house itself by reason of its adjournment, under the Constitution of the state, had ceased or was in abeyance, seeking to investigate, and to require him to testify touching, matters that the Legislature could not itself, or through any committee constituted by it, inquire into, but which matters were peculiarly within the province of the judicial power of the state under its well-ordered criminal laws to examine and decide upon. If these things be true, is it not such an extraordinary condition of affairs as would warrant the intervention of the first court, state or federal, applied to? Need there be any hesitation about acting because of forbearance due the state courts, when their action is not only not involved, but their authority is actually usurped by another and distinct department of government, contrary to the express inhibition of the state Constitution, under which both of them must act? Is not the "free doom" of every citizen under the law as dear and as precious to the American to-day as it was to the Saxon of old? Is his enjoyment of it to be jeopardized for a day by the unwarranted and vexatious action of private citizens acting under a wholly unwarranted and usurped power, not of a judicial, but of a legislative, body? We think there can be but one answer. If these allegations be true, it is not only the exercise of a sound discretion, but an imperative duty, for this court, thus appealed to, to intervene for both the protection of the citizen's right, and the maintenance of the power and jurisdiction of the judiciary, federal and state, to enforce, as constitutionally required of it, without interruption, the laws which it is the sole power of the legislative branch of government to enact.

Therefore the matter resolves itself finally into an examination of whether these allegations are true or not. In re Jordon (D. C.) 49 Fed. 238, speaking of the duty of federal courts touching their exercise of the power to issue these writs in behalf of persons held under state authority, an investigation of the questions raised, where practicable, is not only authorized, but urged, before issuing the writ. We have before us the petition and the return of the arresting officer. Besides these this court, like any other court within the jurisdiction of this state, has right to take judicial notice of the journal of the House of Delegates of the state, so far as pertinent.

From these it appears clearly: On February 24, 1905, within three hours of midnight, when the regular session of the Legislature, by constitutional limitations, was to expire, Albert B. White, then Governor of the state, but whose term of office by like constitutional limitation was to expire nine days thereafter, sent to the House of Delegates this message:

"To the Honorable the Speaker and Members of the House of Delegates: A few days ago certain charges were made against me by a member of the State Senate, and printed broadcast in the newspapers. These charges were that (1) I had an agreement, understanding or contract whereby the fees or emoluments or both, received by the Secretary of State, whom I appointed, were divided with me, or applied, appropriated or paid in some manner to my use and benefit, directly or indirectly, and (2) that I was concerned in an improper manner in the proposed reduction of the license tax on charters of 'non-resident' domestic corporations. In the State Senate a committee was raised to investigate these charges. I and others appeared before the committee and made statements. It is understood that the committee will take no further testimony. I feel that the grave charges made against me have not been duly investigated, especially as there are rumors in circulation that there is evidence of the truthfulness of these charges, or of one of them, which evidence was not presented but withheld under some sort of alleged agreement or understanding; and this has been stated in some newspapers. The House of Delegates has the sole power of impeachment under our Constitution. If I am guilty of these charges, or either of them, I ought to be found guilty and punished, either by impeachment, or on indictment and trial in court. If I am innocent, as I declare I am, I have the right to have that fact declared after a full, free and thorough investigation, and my good name and that of my family vindicated. Besides, I submit that the honor of the state, whose chief officer I am, demands that these charges be promptly and thoroughly inquired into, and their truthfulness established.

"I therefore earnestly request that your honorable body will raise a committee to investigate these charges, and also whether I have been or am to be, in any way whatsoever, the recipient, directly or indirectly, of any of the fees or emoluments of the Secretary of State or of any other officer or person appointed by me; and that such committee be empowered to sit after the adjournment of the Legislature, be given full power to compel the attendance of witnesses, and to send for persons and papers and be instructed to make full and thorough investigation, and when it has completed the same and made its report to file a transcript of the evidence taken before it and its report with the Governor, to be by him laid before the next session of the Legislature, special or regular; and that in the meantime their findings be made public.

"Respectfully, Albert B. White.

"Executive Chamber, Charleston, W. Va., February 24th, 1905."

One hour later Mr. Seaman, a member, submitted to the House the following:

"Whereas, His Excellency, Governor Albert B. White, in a written communication of this date, has requested the House of Delegates to make an investigation of certain charges made against him, as set out in his said communication, therefore,

"Resolved, That the Speaker of this House be and he is hereby instructed to appoint a committee of three members of the House as such committee of investigation. Such committee will meet as soon as practicable and select one of its members chairman, and has leave to sit after the adjournment of the present session, and is hereby instructed to investigate fully and thoroughly the charges and matters as follows:

"First, Whether Governor Albert B. White had or has any agreement, understanding or contract with any one whereby the fees and emoluments of the office of Secretary of State were to be divided or shared with him in any way, manner or form, either directly to himself, or indirectly through any other person, firm or corporation; and whether Governor Albert B. White did

·ever in fact in any way, manner or form receive any of the fees or emoluments of the office of Secretary of State.

"Second, Whether Governor Albert B. White was concerned in any improper manner in the proposed reduction of the license tax on the charters of 'nonresident' domestic corporations.

"Said committee is hereby empowered to compel the attendance of witnesses and to send for persons and papers, to appoint a sergeant-at-arms, necessary stenographers and clerks, and to employ such counsel as may be necessary to ·conduct said investigation. Members of the committee shall receive the same compensation and mileage as are paid to members of the Legislature. Such ·compensation and mileage and other expenses of the committee shall be paid by the Auditor out of the appropriation for contingent expenses of the House ·of Delegates on the certificate of the chairman of the committee."

—Which was immediately adopted, and the Speaker appointed Mr. Seaman, Mr. Maxwell (of Harrison), and Mr. Preston such committee. This committee, it seems, organized, electing Mr. Seaman as chairman, and proceeded with the investigation. Among others, the relator was summoned as witness for a specified date, failed to attend, was again summoned for another day, and failed and refused to attend, whereupon an order of attachment and arrest was issued against him, signed by Seaman as chairman of this committee, directed to Sheriff Carfer, of Wood county, who duly took him into custody, from which he is seeking hereby to be discharged.

Article 5 of the Constitution of West Virginia in a single section provides:

"The legislative, executive and judicial departments shall be separate and ·distinct, so that neither shall exercise the power properly belonging to either of the others; nor shall any person exercise the powers of more than one of ·them at the same time, except that justices of the peace shall be eligible to the Legislature."

The 50 sections of article 6, among other things, provide that the legislative power shall be vested in the Senate and House of Delegates; fixes the number of each of these bodies, the term of office, and the qualifications required of members; that the Legislature shall meet at the seat of government "biennially and not oftener," unless convened by the Governor in special session under limitations set forth; that no session shall continue longer than 45 days without concurrence of two-thirds of the members elected to each house, and neither house, during a session, shall adjourn for more than three days without consent of the other; that a majority of the members elected to each house shall constitute a quorum; that attendance may be compelled; that each shall judge of the election returns and qualifications of its members, elect its presiding officers, appoint its officers, and remove them at pleasure, punish its own members for disorderly conduct, and by two-thirds vote expel once such member. Then in section 26 it provides:

"Each house shall have power to provide for its own safety, and the undisturbed transaction of its business, and may punish, by imprisonment, any person not a member, for disrespectful behavior in its presence; for obstructing any of its proceedings, or any of its officers in the discharge of his duties, or for any assault, threat or abuse of a member, for words spoken in debate. But such imprisonment shall not extend beyond the termination of the session, and shall not prevent the punishment of any offense by the ordinary course ·of law."

By section 45 of this article it is also further provided:

"It shall be the duty of the Legislature, at its first session after the adoption of this Constitution, to provide, by law, for the punishment by imprisonment in the penitentiary, of any person who shall bribe, or attempt to bribe, any executive or judicial officer of this state, or any member of the Legislature in order to influence him, in the performance of any of his official or public duties; and also to provide by law for the punishment by imprisonment in the penitentiary of any of said officers, or any member of the Legislature, who shall demand, or receive, from any corporation, company or person, any money, testimonial or other valuable thing, for the performance of his official or public duties, or for refusing or failing to perform the same, or for any vote or influence a member of the Legislature may give or withhold as such member."

Carrying out this Constitutional requirement, an act of the Legislature of the state was approved April 1, 1873 (embodied in the Code of 1899 as section 5a, c. 147), whereby it was made a felony for any one to bribe by directly or indirectly giving to or bestowing upon any executive or judicial officer, or any member of the Legislature, money, testimonial, or thing of value in order to influence him in the performance of any of his official or public duties, and also making it a felony for any executive or judicial officer to receive any money, testimonial, or thing of value for such purpose, and further disqualifying any one convicted of either offense from ever holding any office of honor or trust in the state. The law prior to that time had been embodied in sections 4 and 5 of chapter 147 of the Code of 1899 (re-enacted from sections 4 and 5 of chapter 194 of the Code of Virginia, 1860), which made these offenses misdemeanors of grave character.

Section 9 of article 4 of the Constitution provides:

"Any officer of the state may be impeached for mal-administration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor. The House of Delegates shall have the sole power of impeachment. The Senate shall have the sole power to try impeachments, and no person shall be convicted without the concurrence of two-thirds of the members elected thereto. When sitting as a court of impeachment, the president of the Supreme Court of Appeals, or, if for any cause it be improper for him to act, then any other judge of that court, to be designated by it, shall preside; and the senators shall be on oath or affirmation, to do justice according to law and evidence. Judgment in cases of impeachment shall not extend further than to remove from office, and disqualification to hold any office of honor, trust or profit under the state; but the party convicted shall be liable to indictment, trial, judgment and punishment according to law. The Senate may sit during the recess of the Legislature, for the trial of impeachment."

Section 7, c. 12, Code 1899, provides:

"When the Senate or House of Delegates, or a committee of either house, authorized to examine witnesses, or to send for persons and papers, shall order the attendance of any witness, or the production of any paper as evidence, a summons shall be issued accordingly, signed by the presiding officer or clerk of such house, or the chairman of said committee, directed to the sheriff or other proper officer of any county, or the sergeant-at-arms of such house, or any person deputed by him. And when served, obedience thereto may be enforced, by attachment, fine or imprisonment, at the discretion of the house which appointed the committee; and if the committee be authorized to sit during the recess of the Legislature or the recess of the house which appointed the committee, then obedience to the summons may be enforced by said committee as aforesaid."

These constitutional and legislative provisions, we believe, are all that can be considered as involved in the determination of the questions before us.

At the very threshold it may be asked whether the limitations of the Constitution were not intended to, and do, substantially prevent legislative investigations through committees during the recess of the body itself. Its provisions expressly limit the sessions to biennial ones, not to exceed a total of 45 days each, only to be extended by concurrent vote of two-thirds of the members of both houses. It fixes, by section 33, art. 6, a per diem compensation, with mileage allowance, and then distinctly provides that no other allowance or emolument shall directly or indirectly be made or paid to the members of either house for postage, stationery, newspapers, or any other purpose whatever. It makes express provision that the Senate may sit during recess for the trial of impeachment cases. Thus it will be seen that not by direct prohibition, but by strong negative limitations, the appointment of legislative committees to sit during recess is condemned. It would seem clear that the framers of this Constitution contemplated that the legislative duties should be performed by the legislative body itself within a fixed period, and for a fixed per diem compensation. The wisdom of such limitation is clear, for otherwise the tendency of the Legislature to resolve itself into committees to investigate one after the other the public institutions and other matters that would furnish plausible excuse during recess, whereby they might extend and increase their own compensation to any number of days short of the total involved in the recess, is very apparent. However, in our view of this case, we do not deem it necessary to decide finally this point which would necessarily involve the constitutionality of a part of section 7, c. 12, of the Code, which we have hereinbefore cited. It can far more appropriately be left for the state courts, construing its own Constitution in its own way and in its own time, to do this.

There is a more grave and crucial question involved, which, if we entertain this writ, must be decided by us, however, and that is whether, under the Constitution of West Virginia, the House of Delegates had the power to constitute this committee for the purpose of investigating the matters set forth in its resolution, clothing it with power to sit in vacation, compel attendance of witnesses, and to arrest and punish recalcitrant ones. It would seem from the reading of article 5, cited above, that the framers of the Constitution determined jealously to safeguard the very fundamental principle, adopted in the national and all the state governments, whereby all governmental power is to be divided into the three great departments, the executive, the legislative, and the judicial, by plain, explicit, and separate article. Not only does it divide the power among these grand departments, but it explicitly provides that neither of these departments shall exercise the powers properly belonging to either of the others, and then proceeds in other articles to define the limitations and powers of each. If we analyze rightly, the real object of this legislative investigation was to ascertain whether or not Albert B. White, as Governor of the state, had re-

ceived or was to receive from Wm. M. O. Dawson any sum of money, or any division of fees or any other thing of value, directly or indirectly, for and in consideration of his appointment by White, as Governor, to the honorable and lucrative office of secretary of state, this appointment, under the Constitution at that time existing, being said White's official duty to make. The second charge is of the same character. The Governor could not "improperly" be connected with legislative action such as to warrant legislative investigation, unless it was such as to warrant impeachment or prosecution.

For what purpose was this investigation to be made? Can it be said that it was a preliminary investigation instituted by the House of Delegates for the purpose of securing information and facts upon which to base its impeachment of the Governor? Certainly not; for this resolution was passed within nine days of the expiration of the term of said White as such Governor by operation of law on March 4, 1905. It was passed less than three hours before the adjournment of the session of the Legislature by constitutional limitation. It expressly provided that the investigating committee was to sit in vacation, and it was expected to make its report to the next succeeding session, long after the said White's term would have expired, and after any impeachment proceeding could be instituted against him; for article 4 of the state Constitution, quoted by us above, expressly limits the extent of impeachment to removal from office. Was the purpose of this resolution to ascertain the guilt or innocence of White and Dawson touching this charge, so that the Legislature might enter judgment and punish one or both, if found by this investigation to be guilty? Such an effort would be a palpable and gross assumption of power on its part, unwarranted, yes, expressly prohibited, by the Constitution. If these charges were and are true, then both White and Dawson are guilty of grave and serious felonies; if false, then they are the victims of cruel and criminal slander or libel. In either event, the only tribunals under the Constitution where these things can be legally investigated are the courts of the state. It is the solemn duty of certain officers of the state, elected for the purpose, to bring such charges before the grand juries having jurisdiction, and full power is vested in the courts to compel not only this relator, but any and all other witnesses, to appear there and testify.

If this investigation was to be made solely for the vindication of these gentlemen charged, or to soothe the outraged feelings of either or both, it is simply enough to say that legislatures are not elected for this purpose, but the courts here are the proper forums wherein damages may be sought and awarded for all such injuries. It would be a very remarkable spectacle, indeed, for Congress and Legislatures of the states to conduct investigations for vindication purposes, at the expense of the people, in every instance where, in the heat of partizan debate, some charge of misconduct, malfeasance, or violation of law is made against a public official, and extend such vindicatory investigation to such officials after they have filled their terms of office and passed into private life.

That this latter was the sole and only purpose for the creation of this committee and for the authorization of this investigation does not depend upon inference and implication alone. On the contrary, it appears positively and without any doubt. It originated with and was solely instigated by the Governor himself. Its origin sprung from his special message sent to the House of Delegates, in which he set forth that the charges had been made by a member of the Senate and printed broadcast in the newspapers; that the Senate had investigated them, and he and others had testified; that he was not satisfied (it is clearly to be inferred that the Senate was). He admits that, "if guilty of these charges, or either of them, be ought to be found guilty and punished, either by impeachment, or on indictment and trial in court." The former he knew to be impossible, under the circumstances; the latter he knew could not be subject of legislative action. He then reaches the erroneous conclusion, the non sequitur, that, if innocent, he "had the right to have that fact declared [by legislative action] after full, free and thorough investigation [by a single branch of the Legislature, where the charge did not originate, and after the other branch, where it did originate, had investigated, but not to his liking or entire satisfaction], and his good name and that of his family vindicated." Thereupon this branch of the Legislature passed the resolution providing for this committee, expressly setting out in the preamble thereto the special message requesting the investigation, and expressly instructing the committee to be appointed only to "investigate fully and thoroughly the charges." This, then, was the sole purpose for the creation of this committee, as clearly appears, and, such appearing, disposes of the argument of counsel based upon the theory that this investigation was authorized in order to furnish the Legislature with facts upon which to base future legislation.

It is true generally, as contended for, that all inferences are to be made and all doubts solved in favor of the legitimacy of the legislative purpose and action, but not when it expressly appears by the act itself, in positive terms, that its purpose is illegitimate and contrary to constitutional limitations.

The principles we have here set forth are involved to a considerable extent in the leading case of Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, where Mr. Justice Miller, with great learning, has discussed and defined the powers of and limitations upon the national House of Representatives in making similar investigations, only authorized to be made by the courts.

Let the petitioner be discharged.