PEOPLE *ex rel.* SABOLD *v.* WEBB, Sergeant at Arms.

(*Supreme Court, Special Term, Albany County.* March 29, 1889.)

1. CONTEMPT—POWER OF LEGISLATURE TO PUNISH FOR.
    The legislature of this state does not possess the common-law power to punish for contempt which is exercised by the English parliament. It has only such powers in that respect as are expressly conferred upon it.

2. SAME—LEGISLATIVE PROCEEDINGS.
    1 Rev. St. N. Y. c. 7, tit. 2, § 13, provides that the power of each house to punish as a contempt and by imprisonment a breach of its privileges "shall not hereafter be exercised except against persons guilty of one or more of the following offenses. * * * That of refusing to attend or be examined as a witness, either before the house or a committee, or before any person authorized by the house or by a committee to take testimony in legislative proceedings." Laws 1888, c. 582, provided for the making of certain repairs and erections in the state capitol, and confided them to a committee composed of members of the legislature of 1888. The committee let the work by contract, and it was performed and paid for. The legislature of 1889 discovered that the work was improperly done, and that dishonest profits had probably been made. It was resolved that the public press and sentiment demanded an investigation, and a committee was appointed "for the purpose of a thorough investigation of all questions connected with" the work in question, "with power to send for persons and papers," and to report to the house "such recommendations as in its judgment the public interest may require, and for the purpose of remedial legislation." *Held,* that the knowledge acquired by the committee's investigations could not be used for the purposes of legislation, within the meaning of the statute relating to contempt, and that the legislature had no power to punish a witness for contempt in refusing to testify before the committee.

3. SAME.
    The clause in the resolution "and for the purpose of remedial legislation" could not of itself confer jurisdiction.
4. WITNESS—PRIVILEGED COMMUNICATIONS.
    Telegrams are not, as to the operator or custodian, privileged communications.

*Habeas corpus.*

This case comes before the court on an application of the relator, Frank W. Sabold, by *habeas corpus*, who is in custody of the defendant under a warrant issued by the speaker of the assembly, by order of the house. The petition of the relator, and the return of the defendant thereto, discloses the undisputed facts upon which the legal questions involved in this application arise. By chapter 582 of the Laws of 1888 five members of the assembly, of whom the speaker was one, were given charge of certain repairs and alterations in the capitol, according to certain plans and specifications, to be approved by a majority of them, the work to be performed by the superintendent of public buildings. The act contained an appropriation out of which such work and materials were to be paid for, fixed the time of its completion, and contained certain other provisions in reference to the same. The case shows that by virtue of the power conferred by such act the committee advertised for and received proposals for such work and material, and awarded the contract for said work and materials to John Snaith. The act above referred to required the work to be performed ready for use on or before the 15th of December, 1888. It appears inferentially from the papers before the court on this application that a contract was entered into by the committee appointed under this act with said Snaith, who did and assumed to do the work. On the 28th of February, 1889, by a preamble and resolution referring to and reciting the report of a committee of experts, and also to a confirmatory report by the committee of ways and means of the assembly, to the effect that a profit of $100,000 or more had been made in the contract for the new ceiling and staircase, and that it had not yet been ascertained into what channels said money had gone, and that the public press and public sentiment demanded a thorough investigation be made to ascertain the facts in the case, it was resolved that a committee of seven members named in the resolution be appointed for the purpose of a thorough investigation of all the questions connected with the construction of the assembly ceiling and staircase, "with power to send for persons and papers  *  *  *  and report to this house *  *.  * such recommendations as in its judgment the public interest may require, and for the purposes of remedial legislation." On the 6th day of March this committee, through its chairman, issued its subpœna, directed to Frank W. Sabold, the resident superintendent and manager of the Western Union Telegraph Company in the city of Albany. The subpœna recited substantially the matters contained in the preamble and resolutions by which the committee was appointed, and concluded with the following command: "You are hereby notified and required to attend before said committee at the capitol building assembly parlor, Albany, N. Y., on the 7th day of March, 1889, at 11 o'clock A. M., there to give such information touching the subject of inquiry as may be in your possession. And you are hereby further directed to bring with you before said committee all telegrams addressed to John Snaith, Arthur H. Rowe, and Mrs. John Snaith, and copies of telegrams addressed to either of them, or to James McGuire, or Timothy J. Sullivan, or C. B. Andrews, since the 28th day of February, 1889, meaning to include all telegrams from or to either of said parties passing through the Western Union Telegraph Company, at its Albany offices, and such other documents in your custody as may be required in the investigation of the said subject. By order of the committee. [Signed] HAMILTON FISH, Jr., Chairman." In obedience to the command of such subpœna the relator appeared before said committee, and was sworn, and testified that he had received the subpœna containing the require-

ments as to telegrams, and had started to make examination in reference to the same. He was then asked if he found any such telegrams, to which relator replied, "I am not allowed to answer that question." The witness stated in various forms to several questions that it was against the rules of the company to give any information, directly or indirectly, in connection with any telegrams, and he declined to answer any question upon that subject, putting his refusal upon the ground that it was against the rules of the company, and that he was acting under the orders of the company and the advice of its attorney. The subpœna *duces tecum* was after some negotiation between the committee and the president of the telegraph company modified so as to read as follows: "And you are further directed to bring with you before said committee all telegrams in the Albany office of the Western Union Telegraph Company addressed to John Snaith, Arthur H. Rowe, or Mrs. John Snaith, either at New York or Philadelphia, from any person, which refer to any proceeding before this committee, or to the accounts of Mr. Snaith, or to Mr. Snaith's books, or to the movements of Mr. Rowe, Mr. Snaith, Mr. Cuyler, or Mr. Burch. *Secondly.* Copies of all telegrams received from John Snaith, Mrs. J. Snaith, or Arthur H. Rowe, and dated either at New York or Philadelphia, and addressed to James McGuire, or Timothy J. Sullivan, or C. B. Andrews, or either of them, having reference to the said subject-matter, between the 25th of February and the 8th of March, 1889, and such other documents in your custody as may be required to the investigation of the subject. And you are further notified and required to notify the president or vice-president of said telegraph company of this subpœna." After the service of this subpœna the relator again appeared before the committee, and, on being interrogated by members of the committee in reference to telegrams described in the subpœna *duces tecum*, again declined to answer. His refusal was reported to the assembly, and a warrant was by resolution of the house issued by the speaker, under which the relator was arrested by the defendant, and brought to the bar of the house for contempt, and, being required to purge himself of his contempt, stated by counsel that he declined to produce the telegrams, under the direction of the company, and resolution was therefore passed by the assembly declaring the relator guilty of a contempt, and therefore the speaker issued his warrant, directed to the defendant, committing the relator to the common jail of Albany county.

*Myer Nussbaum* and *Edwin Countryman,* for relator.   *Charles F. Tabor,* Atty. Gen., for defendant.

MAYHAM, J.   The relator claims that the committee had no power to compel the answer to the question propounded and the production of the telegrams called for—*First,* because they were privileged communications, which the relator had no right to disclose as a witness; *second,* that the power of the legislature and its committee to take testimony, and compel answers to questions and production of papers, is confined solely to legislative proceedings or to investigations to promote remedial legislation. As to the first proposition I am of opinion, upon principle and authority, that telegrams, as such, are not privileged; that they are clearly distinguishable from communications sent by mail while in transit; and that their production on a proper subpœna would not subject the operator or custodian to the penalties imposed by statute for a willful disclosure or publication of their contents.

The second question raised by the relator is as to the power of the assembly, or any committee appointed by it, to institute and carry forward an investigation of the character referred to in these proceedings, which, it is insisted, relates only to the manner in which the committee of a former legislature performed its duties in making a contract for repairing the ceiling of the assembly chamber and the construction of a staircase, and the manner in which the contract made by them with Snaith was performed, all of which re-

lated to past and fully completed transactions, and did not and could not fur-
nish any *data* for future remedial legislation; that, by the terms of the act
under which the committee of the assembly of 1888 was created, their powers
were limited as to the time and manner of performance, and that limit ex-
pired before the commencement of this legislature; that the work they were
authorized to supervise was to be finished before the opening of this as-
sembly, and that the contract made by them with Snaith had expired by its
own limitation, and that no future legislation could be applicable thereto;
that the whole subject-matter sought to be investigated has passed beyond
the domain of legislation, and as to whether it was properly or improperly exe-
cuted can only be the subject of judicial investigation; that vested and fixed
rights have attached under the contract which no future legislation can affect
without taking away vested rights or impairing the obligation of a contract
already made and executed, and, whether properly made or properly fulfilled,
is not a legislative, but a judicial, question. In examining this question we
start with the fundamental proposition that under our government the pow-
ers are divided into legislative, judicial, and executive branches or depart-
ments.    Each of these three departments of government is restricted to the
exercise of its own legitimate functions, and, unless a legal and constitu-
tional warrant can be found, neither should be permitted to invade the domain
of the others.    In *People* v. *Keeler*, 99 N. Y. 480, 2 N. E. Rep. 623, the
court of appeals in discussing this question say: "The constitution of the
United States declares in terms that the judicial power of the United States
shall be vested in one supreme court and in such inferior courts as the con-
gress may from time to time order or establish.    Although no similar dec-
laration is contained in the constitution of this state, still it is a recognized
principle that in the division of power among the great departments the
judicial power has been committed to the judiciary, as the executive power
has been committed to the executive, department, and the legislative to the
legislature, and that body has no power to assume the functions of the ju-
diciary to determine controversies among citizens, or even to expound its
own laws, so as to control the decisions of the courts in respect to past
transactions.  *  *  *  To declare what the law shall be is a legislative
power; to declare what it is or has been is judicial;  *  *  *  but, not-
withstanding this general division of powers, certain powers, in their nat-
ure judicial, are by the express terms of the constitution vested in the legis-
lature.    The power of impeachment is vested in the assembly.    Each house
is made the judge of the qualifications and election of its own members."
These powers, conferred in express terms by the constitution, afford no
warrant, however, for investing the legislature with judicial functions
not expressly conferred.    On the contrary, the fact that these are expressly
enumerated judicial powers affords a presumption that those not conferred in
express terms are withheld, within the maxim, *expressio unius est exclusio
alterius.*    It is insisted by the learned attorney general that the legislative
power to punish for contempt is a common-law power, derived from the
power exercised in the English parliament, and inheres in the state legisla-
ture under our constitution, and has been exercised from the earliest history
of the state, and he cites Lord Courtney's Reports, (4 Doc. Colonial Hist.
1121,) and other early precedents in the colonial history of the state.    But
in the British government the distinction between legislative and judicial
powers is not as marked and distinct as under our system of government,
and the British parliament has always possessed and exercised a large share
of judicial power.    But the power of our legislature to punish for contempt
is regulated by statute, and the question must be determined under the
provisions of that statute.    Section 13, of title 2, c. 7, pt. 1, of the Revised
Statutes provides: "Each house has the power to punish as a contempt, and
by imprisonment, a breach of its privileges, or of the privileges of its mem-

bers, but such power shall not hereafter be exercised except against persons guilty of one or more of the following offenses." The statute then enumerates five distinct offenses, only one of which is applicable to the case now under consideration, and that is subdivision 4, which is as follows: "That of refusing to attend or be examined as a witness, either before the house or a committee, or before any person authorized by the house or by a committee, to take testimony in legislative proceedings." In *People* v. *Keeler*, 99 N. Y. 474, 2 N. E. Rep. 619, RAPALLO, J., in discussing this question, says: "The five (5) enumerated offenses are the only ones which either house is authorized to punish as contempts, and they take the place of the numerous offenses and acts which were treated by parliament as contempts." It will be seen that the discussion under this statute in the decision referred to the question, was this testimony sought to be taken in a legislative proceeding? If it was, and the inquiry did not relate to privileged matter, and was called for by a proper subpœna *duces tecum*, then the witness was bound to answer. It seems well settled that the legislature of the state cannot, nor can any committee appointed by it, constitute itself into a court of general jurisdiction, or a grand inquest, for the purpose of inquiring into the conduct of a citizen not a member of its body, nor can it compel the answer of a witness on an inquiry or investigation before it, except for legislative purposes, or in acquiring information upon which to predicate remedial legislation. In *People* v. *Keeler*, 99 N. Y. 477, 2 N. E. Rep. 621, Judge RAPALLO, in discussing this subject, uses the following unequivocal language: "This decision necessarily involved the point stated in other parts of the opinion, that a legislative body is not to be assimilated to a court of general jurisdiction; that congress has no general power of adjudicating upon contempts. The reasoning and authorities upon which this decision is based convince us that it is incontestable,"—and he cites, in support of this conclusion, *Stockdale* v. *Hansard*, 9 Adol. & E. 1, Opinion of COLERIDGE, J; *Kielley* v. *Carson*, 4 Moore, P. C. 68; *Burnham* v. *Morrissey*, 14 Gray, 226.

It will be borne in mind that in making this statement the learned judge was discussing the power of the state legislature, and not of congress, and the conclusion reached seems to be that neither congress nor the state legislature derive any of their powers to punish a witness for contempts from the common law, or any support, in the exercise of that power, from the precedents of practice of the English parliament, but all their powers are derived from the federal and state constitutions, and statutes enacted thereunder. Assuming, therefore, as we must under the authorities, that the legislature has no general judicial powers, and that it can confer none upon its committees, and that its power to punish contumacious witnesses is confined strictly to examinations for legislative purposes, we are forced in this case to the consideration of the question, was the investigation in which the special committee of the house was engaged, when the relator refused to answer and produce papers, for legislative purposes, or to promote beneficial legislation, or was it inquisitorial, in the nature of a judicial investigation? The answer to this question is more delicate and embarrassing than is the inquiry into the power of the legislature. It must be conceded, I think, that the subject under investigation was the manner in which the provisions of chapter 582 of the Laws of 1888 had been executed. As has been seen, that law related exclusively to the making of certain repairs and erections in the capitol, which were under the act confided to a committee composed of members of the legislature of 1888, the work to be done by the superintendent of public buildings, to be done in accordance with plans and specifications to be approved by the committee, and completed before the 15th day of December, 1888. This work was let by contract in writing by the committee to one Snaith, and by him in part sublet to Sullivan, the whole to be completed at the time above indicated. After the organization of the legislature of 1889, and after the

legislature of 1888 and its committees were *functus officio*, it was discovered that the work was improperly done, perhaps that the law had been violated, and in the language of the preamble the committee on appropriations, by their report, in effect, confirm the findings of the committee of experts that a profit of $100,000 or more has been made in the contract for the new ceiling and staircase, and "it has not yet been ascertained into what channel said money has gone." The preamble then declares that the public press and public sentiment demanded a thorough investigation be made to ascertain the facts in the case. Upon this predicate of facts the resolution is adopted appointing this committee "for the purpose of a thorough investigation of all questions connected with the construction of the assembly ceiling and staircase, with power to send for persons and papers." The resolution authorizes the employment of counsel, stenographer, accountants, and experts, and to report to the house such recommendations as in its judgment the public interest may require, and for the purpose of remedial legislation.

As we have seen, a legislative committee may summon and examine witnesses in legislative proceedings, or to promote remedial legislation; but when they seek to enforce obedience to their orders by proceedings for contempt they must be acting strictly within the limits of their delegated authority. Both committee and witness are subject to the provisions of the statute. In this case, the recitals in the preamble, purporting to give reasons for the adoption of the resolution of investigation, do not suggest any new legislation. The chief object seems to be the gratification of a very natural, and, perhaps, very laudable, curiosity on the part of the press and the public to know what had been done with the $100,000 profit on the contract. But could that knowledge be used for the purposes of legislation, within the fair meaning of that term, as used in the statute? It will hardly be pretended that information such as was called for by the resolution was necessary as a warning to the legislature against passing another act similar to chapter 582 of the Laws of 1888. Nor could any remedial legislation be enacted to relieve from the operation of that act. It had spent its force and accomplished its purpose before the organization of the present legislature. Nothing could be accomplished by its repeal, nor was it in force so as to be the subject of an amendment. All acts contemplated by it had been performed either properly or improperly, and had passed into history. The commission created under it had expired by the limitation of their official term and the force of the act by which they were appointed. The contract made by the commission with the builder had been executed, and either broken or performed. All legislative power over it had ceased, and all that remained were the judicial questions whether the same had been properly or improperly made, and whether it had been properly performed by the contracting parties. It could not be claimed that the legislature could, in its legislative capacity, resume or exercise any control over it. Any act of the legislature, modifying the provisions of the original acts under which the parties contracted, would be an unconstitutional interference with the obligations of a contract. This case, in many respects, is not unlike that of *Kilbourn* v. *Thompson*. In that case a committee of congress sought to inquire into a business transaction affecting the interest of the United States, or one of the departments of the government, and for that purpose summoned Kilbourn before the committee of the house of representatives as a witness. On his examination he refused to answer certain questions propounded by the committee, or to produce certain papers in his possession of which the committee desired an inspection. For that refusal he was arraigned at the bar of the house and adjudged guilty of contempt, and by warrant committed to the custody of Thompson, as sergeant at arms of the house, and by him, under the authority of the order of the house, imprisoned. The question coming before the supreme court of the United States, it was adjudged that the house acted without jurisdiction, and that the imprisonment

for contempt was illegal. *Kilbourn* v. *Thompson,* 103 U. S. 168. In commenting upon that branch of the case, the court of appeals, in *People* v. *Keeler,* 99 N. Y. 476, 2 N. E. Rep. 620, uses this language: "In *Kilbourn* v. *Thompson,* which was a similar action, the plaintiff had, on proceedings similar to those taken in the present case, been convicted of a contempt, and sentenced by the house of representatives to imprisonment. It appeared on the face of the proceedings that the contempt consisted of his refusal to answer a question propounded by a committee of the house, appointed by a resolution, which was set forth. This resolution directed the committee to investigate certain business transactions in which the United States government was interested simply as a creditor of one of the parties, and the supreme court held that the preamble and resolution under which the committee was appointed showed upon their face that the investigation ordered did not have for its object any legislative action or the impeachment of any officer of the government, but the collection of a debt owing to the government,—a power which congress could not exercise, but which was vested only in courts of justice; that, in ordering such an investigation, the house of representatives exceeded the limits of its powers, and consequently the committee had no authority to require the plaintiff to testify before it. On this sole ground the decision of the court was placed, but in arriving at this conclusion several important points which have a bearing upon the question now before us were discussed in the highly instructive opinion of MILLER, J." That case differs from this, however, in the fact that in this case, at the conclusion of the resolution appointing this committee, the following assertion is added, "and for the purpose of remedial legislation." If, by this declaration of the purpose of the investigation, the court could see any field opened for legislation growing out of the investigation, it would clearly be the duty of the court to give full effect to that declaration. But such declaration alone, unsupported by any fact, could not confer jurisdiction. If it could, then, by incorporating such a declaration in a resolution, a legislative committee could invade private rights, and thus inquisitorially proceed to investigate all the transactions of an individual or a community, under the delusive pretense of remedial legislation, and thus nullify the provisions of the statute above referred to, limiting the power of the legislature to punish for a contempt. The rule is elementary that the mere assertion of jurisdiction does not confer it upon a tribunal of special and limited authority. If I am right in the conclusion at which I have arrived in this case, then the question involved is one of jurisdiction of the committee and the house, and that question may be reviewed on *habeas corpus,* and the right of the relator may be determined on this application.

A very important question is raised in this case as to the power to compel the custodian of telegrams sent through an office, and left in the custody of the company, to produce the same upon a subpœna *duces tecum,* served upon the officer of the telegraph company in whose custody they are left. This question has been argued at great length, and with marked ability, both by the counsel for the relator and the attorney general, but the conclusion reached by me relieves me from expressing any opinion on that subject. If I am correct in holding that the committee, under the circumstances of this case, had no power or jurisdiction to punish the relator as for a contempt, then it is my duty to order his discharge. In *People* v. *Warden,* 100 N. Y. 20, 2 N. E. Rep. 870, it was held that, under section 2031 of the Code of Civil Procedure, it is the duty of the judge upon hearing or return to a writ of *habeas corpus* to inquire into the jurisdiction of the tribunal which rendered the judgment or decree, and to discharge the prisoner, where it appears there was a lack of jurisdiction over the person or subject-matter. In this case Judge RUGER holds that the recital of jurisdiction on facts in the judgment of courts of special and limited jurisdiction does not furnish even *prima facie* evidence of its existence. I am of the opinion that the assembly had

no jurisdiction to compel the relator to answer the question and furnish the telegrams demanded, and that his committal for contempt in refusing to comply with the requirements of the committee was without jurisdiction, and void, and that he must therefore be discharged.