## Shelby v. Second National Bank of Uniontown et al.

*Frank B. Ingersoll*, of *Smith, Buchanan, Scott & Gordon* and *H. Eastman Hackney*, of *Shelby, Hackney & Ray*, for plaintiff.

*D. M. Hertzog*, for defendant.

*Oliver K. Eaton, J. Julius Levy* and *J. Cullen Ganey*, for intervening defendants.

HUDSON, P. J., January 24, 1933.—

### Statement of the pleadings

On November 26, 1932, a bill of complaint was filed, asking for an injunction to restrain the defendant from disclosing to the Senate Investigating Committee any of the bank records of S. Ray Shelby, a Public Service Commissioner. A preliminary injunction issued as prayed for, which was duly served upon The Second National Bank of Uniontown, defendant. On December 1, 1932, at the time set for a hearing, defendant appeared by counsel in open court and filed a statement in which it is set forth that the bank is only custodian of said records and that the Senate Investigating Committee is the real defendant. On the same day the members of the Senate Investigating Committee, by coun-

sel, appeared in court and were joined as defendants. The hearing was continued until December 9, 1932, at 10 a. m., at which time the parties appeared in court, and testimony was taken and arguments heard.

The question involved is the right of a committee of the Senate, investigating the Public Service Commission, to subpoena the bank records of S. Ray Shelby, a member of the Public Service Commission, against whom no charges have been filed.

## Discussion

The Public Service Commission of our Commonwealth was created by the Act of Assembly of July 26, 1913, P. L. 1374, by what is known as the Public Service Company Law. The commission consists of seven members, one of whom is chairman of the board. The term of office is for a period of 10 years.

S. Ray Shelby, plaintiff, is a member of the commission. He was appointed to that position in 1918, and reappointed in 1928.

W. D. B. Ainey, chairman of the board, resigned August 2, 1932, after charges had been preferred against him. Emerson Collins, a member of the board who had been ill for many months and unable to perform the duties of the office, delivered his resignation to the Governor on August 1, 1932, to become effective as of October 1st. His resignation was accepted and became effective October 1st.

The legislature of our Commonwealth met in extraordinary session on June 27, 1932, and continued in session until August 19th. While in session, the Honorable Gifford Pinchot, Governor of our Commonwealth, appeared before the Senate on August 10th and delivered an address in which he asked for a "full and thorough-going investigation of the system by which the public utilities have controlled the Public Service Commission." We quote the following from his address:

"Rightly or wrongly, the belief has spread that the Ainey resignation was forced to prevent further exposure. It would constitute the severest indictment of the Senate of Pennsylvania if the Ainey resignation were allowed to prevent the fullest investigation, not only of the utilities from which the bribes came, but of any other utilities which may have had similar relations with any commissioner now in office or who has been in office during the last 10 years, at least."

Nowhere in his address does the Governor mention the name of any public utility company or the name of any commissioner then in office.

On August 18th, the Senate of the Commonwealth adopted a resolution providing for a full and complete investigation of the relations existing between public utility companies and the Public Service Commission and the appointment by the president pro tempore of the Senate of a committee of seven of its members to make such investigation. A committee was duly appointed and immediately began its investigation.

On November 16th, said committee issued a subpoena duces tecum, directed to The Second National Bank of Uniontown, to produce before the committee at Harrisburg on November 30th at 10 a. m., "all ledger cards, deposit tickets, loan records, and all other papers and records pertaining to the accounts of S. Ray Shelby and your transactions with him; also all contracts and leases for safe deposit boxes leased from you by S. Ray Shelby, together with all records showing visits to safe deposit boxes by S. Ray Shelby; all books, records, and accounts showing purchases and sales of stocks and bonds and other securities to or for the account of S. Ray Shelby; also all books, records, and accounts showing manner of payment to you by S. Ray Shelby for stocks, bonds, or other securities sold to him by you or purchased by you for his account; also all

books, records, and accounts showing manner of repayment of loans to you by S. Ray Shelby."

A preliminary injunction was issued; testimony was taken; the case was argued, and the injunction continued.

We will discuss the reasons assigned why the injunction should be continued, in the order in which they are set forth in the bill of complaint and its amendment.

First: "There has been no showing whatever that the papers and records required to be produced, under said subpoena duces tecum, are pertinent to the pending· investigation."

It has been repeatedly held by our courts that in investigations of this kind the materiality of the evidence sought should appear. There was no testimony offered on the part of the committee that there was anything in the records of the bank pertaining to S. Ray Shelby's account which would be of any aid to the committee so far as future legislation is concerned. If the committee had knowledge of any public utility company or of any individual who had paid money to Commissioner Shelby with a corrupt intent, it would have been very easy for the committee to prove this fact. It would seem to us that the burden would be upon the committee to prove that the subpoena duces tecum was employed to obtain testimony for a legislative purpose, or that this should appear from the pleadings or the testimony.

In considering the reasons advanced why the injunction which issued should be continued, there is one thing which must be kept constantly in mind, and that is this—there have been no charges preferred against S. Ray Shelby. If charges had been preferred, we would have different questions confronting us.

Let us consider first the purpose which would justify the Senate in its investigation. There was only one legitimate object the Senate could have in ordering the investigation, and that was to aid it in legislating—that is, to secure evidence which would enable it to make recommendations at the next meeting of the General Assembly as to remedial legislation on the subject in controversy. The appellate courts of our States and the Supreme Court of the United States have repeatedly held that this is the only purpose which would justify an investigation.

The case of McGrain v. Daugherty, 273 U. S. 135, is very much in point. A brief recital of the facts will enable one to better understand the ruling of the court.

Harry M. Daugherty became Attorney General of the United States March 5, 1921, and held that office until March 28, 1924, when he resigned. Late in that period, various charges of misfeasance and nonfeasance in the Department of Justice after he became its supervising head were brought to the attention of the Senate by individual senators, and made the basis of an insistent demand that the department be investigated.

A committee of five senators was appointed to investigate circumstances and facts and report the same to the Senate, concerning the alleged failure of Harry M. Daugherty, Attorney General of the United States, to prosecute properly violators of the Sherman Anti-Trust Act and so forth, alleging neglect and failure of the said Harry M. Daugherty, Attorney General of the United States, to arrest and prosecute Albert B. Fall, Harry F. Sinclair, E. L. Doheny, C. L. Roberts, and others.

In the course of the investigation, the committee caused a subpoena to be served upon Mally S. Daugherty, president of the Midland National Bank, of Midland, Ohio, and a brother of Harry M. Daugherty, to appear and bring with him deposit ledgers of said bank since 1920, also note files and transcript of

owners of every safe deposit vault, and so forth. Mally S. Daugherty, the witness, did not appear, and neither were the records produced. Another subpœna was served upon him, but nothing was said in this subpœna about bringing the records, books, papers, and so forth.

In this connection, it is of interest to note that in the Court of Common Pleas of Fayette county, Ohio, sitting in equity, the said Midland National Bank was plaintiff, and B. K. Wheeler and Smith W. Brookhart were defendants. A temporary restraining order was granted, restraining and enjoining the bank from delivering any of its records, and so forth. Said injunction has not been modified, no further action has been taken in said case by said court, and the injunction is still in full force and effect.

On his failure to appear the second time, a warrant was issued to the sergeant-at-arms of the Senate and was delivered to John J. McGrain, his deputy, and the deputy, proceeding under the warrant, took the witness into custody at Cincinnati, Ohio, for the purpose of bringing him before the bar of the Senate, as commanded. Thereupon the witness petitioned the Federal district court in Cincinnati for a writ of habeas corpus. After a hearing, the court held the attachment and the detention unlawful, and discharged the witness: Ex parte Daugherty, 299 Fed. 620. An appeal was taken directly to the Supreme Court of the United States.

The Supreme Court, through Mr. Justice Van Devanter, held that there were two questions involved (273 U. S. 135, 154) :

"(a) Whether the Senate—or the House of Representatives, both being on the same plane in this regard—has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution, and (b) whether it sufficiently appears that the process was being employed in this instance to obtain testimony for that purpose."

As to the first question, the court said (page 173) : "neither house [of Congress] is invested with 'general' power to inquire into private affairs and compel disclosures, but only with such limited power of inquiry as is shown to exist when the rule of constitutional interpretation just stated is rightly applied. . . .

"We are of opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."

As to the second question, the court, continuing, said (pages 176 to 179) : "We come now to the question whether it sufficiently appears that the purpose for which the witness's testimony was sought was to obtain information in aid of the legislative function. . . . .

"We are of opinion . . . . that it sufficiently appears . . . . that the object of the investigation . . . . was to obtain information for legislative purposes . . . .

"The only legitimate object the Senate could have in ordering the investigation was to aid it in legislating. . . .

"We think the resolution and proceedings give no warrant for thinking the Senate was attempting or intending to try the Attorney General at its bar or before its committee for any crime or wrongdoing."

In this case specific charges had been preferred, and the court held that the Senate Committee had the authority to compel a person to appear before it and give such testimony as would enable the committee to exercise a legislative function belonging to it under the Constitution. In the instant case, no charges had been preferred, and it did not sufficiently appear that the records sought were for the purpose of obtaining information in aid of this function.

As to the power of an investigating committee to examine the private records of a citizen, our courts have held that an investigating committee does not have the power to conduct a public investigation into the personal and private affairs of a citizen under the pretense of its power to investigate for the purpose of legislation.

In Greenfield v. Russel, Auditor, et al. 292 Ill. 392, 400, 127 N. E. 102, 105 the Supreme Court of Illinois held: "It must also be conceded that a State legislature has power to obtain information upon any subject upon which it has power to legislate, with a view to its enlightenment and guidance. This is essential to the performance of its legislative functions, and it has long been exercised without question. . . . . While this is true, it cannot violate the constitutional rights of any institution or of any individual by conducting a public and judicial investigation of any charges made against such person or institution under the pretense or cloak of its power to investigate for the purpose of legislation. . . . . All such investigations, when judicial in character, made by the General Assembly are absolutely without authority and in violation of . . . .

"There can be no question but that the investigation in question is judicial in character."

In Hague's Petition, 105 N. J. Eq. 134, 137, 147 Atl. 220, 222, Fallon, Vice Chancellor, says: "In *People* v. *Webb*, 5 N. Y. Supp. 855, it is said to be a well-settled rule that the legislature of a state cannot, nor can any committee appointed by it, constitute itself into a court of general jurisdiction or a grand inquest, for the purpose of inquiring into the conduct of a citizen not a member of its body, nor can it compel the answer of a witness on an inquiry or investigation before it except for legislative purpose or in acquiring information upon which to predicate remedial legislation. The investigation carried on by the committee designated in the aforesaid joint resolution, and by the joint session aforesaid, was in the nature of a *judicial* investigation, and therefore unlawful. A legislature, and *a fortiori* a *joint session* or a *committee*, as in the case *sub judice*, cannot violate the constitutional rights of a person by conducting a public investigation of charges made against such person, either directly or by *innuendo*—under the pretense or cloak of its power to investigate for the purpose of acquiring information for legislation, whether the investigation be for the purpose of laying a foundation for the institution of criminal proceedings, for the aid and benefit of grand juries in finding indictments, for the purpose of intentionally injuring such persons, or for any ulterior purpose."

Ex parte Caldwell, 138 Fed. 487, was a case where His Excellency, the Honorable Albert B. White, Governor of the State of West Virginia, asked the legislature for the appointment of a committee to investigate his alleged misconduct. Dayton, Dist. J., held (page 495); "Was the purpose of this resolution to ascertain the guilt or innocence of White and Dawson touching this charge, so that the Legislature might enter judgment and punish one or both, if found by this investigation to be guilty? Such an effort would be a palpable and gross assumption of power on its part, unwarranted, yes, expressly prohibited, by the Constitution. If these charges were and are true, then both White and Dawson are guilty of grave and serious felonies; if false, then they are the victims of cruel and criminal slander or libel. In either event, the only tribunals under the Constitution where these things can be legally investigated are the courts of the state. It is the solemn duty of certain officers of the state, elected for the purpose, to bring such charges before the grand juries having jurisdiction, and full power is vested in the courts to compel not only this relator, but any and all other witnesses, to appear there and testify."

In Kilbourn v. Thompson, 103 U. S. 168, it appeared that the resolution of the House under which Kilbourn was summoned and examined as a witness directed its committee to examine into the history and character of what was called "the real-estate pool" of the District of Columbia; and the preamble recited, as the grounds of the investigation, that Jay Cooke & Co., who were debtors of the United States and whose affairs were then in litigation before a bankruptcy court, had an interest in the pool or were creditors of it. Mr. Justice Miller, speaking for the court, said (page 194): "The resolution adopted as a sequence of this preamble contains no hint of any intention of final action by Congress on the subject. In all the argument of the case no suggestion has been made of what the House of Representatives or the Congress could have done in the way of remedying the wrong or securing the creditors of Jay Cooke & Co., or even the United States. Was it to be simply a fruitless investigation into the personal affairs of individuals? If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country. By 'fruitless' we mean that it could result in no valid legislation on the subject to which the inquiry referred."

Did the committee have the right to subpoena all of Shelby's bank records? We think not. The courts have held that only such records as are evidence may be subpoenaed.

This question is thoroughly discussed in Federal Trade Commission v. American Tobacco Co. 264 U. S. 298, 303, 307, by Mr. Justice Holmes, who, speaking for the court, says: "These are two petitions for writs of mandamus to the respective corporations respondent, manufacturers and sellers of tobacco, brought by the Federal Trade Commission under the Act of September 26, 1914, c. 311, § 9, 38 Stat. 717, 722, and in alleged pursuance of a resolution of the Senate passed on August 9, 1921. The purpose of the petitions is to require production of records, contracts, memoranda and correspondence for inspection and making copies. They were denied by the District Court. 283 Fed. 999. The resolution directs the Commission to investigate the tobacco situation as to domestic and export trade with particular reference to market price to producers, &c. . . . . By § 9 for the purposes of this act the Commission shall at all reasonable times have access to, for the purposes of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against and shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. . . .

" . . . . the Commission claims an unlimited right of access to the respondents' papers with reference to the possible existence of practices in violation of §5.

"The mere facts of carrying on a commerce not confined within state lines and of being organized as a corporation do not make men's affairs public, as those of a railroad company now may be. *Smith* v. *Interstate Commerce Commission*, 245 U. S. 33, 43. Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (*Interstate Commerce Commission v. Brimson*, 154 U. S. 447, 479), and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent. . . . It is contrary to the first

principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up. . . .

"The right of access given by the statute is to documentary evidence—not to all documents, but to such documents as are evidence. The analogies of the law do not allow the party wanting evidence to call for all documents in order to see if they do not contain it. Some ground must be shown for supposing that the documents called for do contain it. Formerly in equity the ground must be found in admissions in the answer. Wigram, Discovery, 2d ed., § 293. We assume that the rule to be applied here is more liberal but still a ground must be laid and the ground and the demand must be reasonable. *Essgee Co.* v. *United States*, 262 U. S. 151, 156, 157. A general subpoena in the form of these petitions would be bad. Some evidence of the materiality of the papers demanded must be produced. *Hale* v. *Henkel*, 201 U. S. 43, 77. In the state case relied on by the Government, the requirement was only to produce books and papers that were relevant to the inquiry. *Consolidated Rendering Co.* v. *Vermont*, 207 U. S. 541. . . .

"The demand was not only general but extended to the records and correspondence concerning business done wholly within the State. This is made a distinct ground of objection. We assume for present purposes that even some part of the presumably large mass of papers relating only to intrastate business may be so connected with charges of unfair competition in interstate matters as to be relevant, *Stafford* v. *Wallace*, 258 U. S. 495, 520, 521, but that possibility does not warrant a demand for the whole."

How could an investigation of S. Ray Shelby's bank records be of any aid to the committee in recommending legislation at the next meeting of the Senate? To ask the question is to answer it.

By way of illustration, let us suppose that the bank records of S. Ray Shelby would disclose a deposit to his credit made by a public utility company. How would that fact, or similar facts, assist the committee in recommending legislation to the next legislature?

We have legislation, and have had it since the organization of our government, making it a crime for anyone to offer or give bribes to a public officer or for a public officer to be guilty of malfeasance in office. It could hardly be seriously contended that we do not have legislation to punish any public servant for wrongdoing.

If S. Ray Shelby has been guilty of wrongdoing or has violated any of our criminal statutes, the proper procedure would be in our criminal courts.

The Senate Investigating Committee has no authority to investigate S. Ray Shelby's bank records for the purpose of obtaining information for a prosecution.

Second: "The disclosure of Shelby's bank records would constitute an unlawful search and seizure of his property, and an invasion of his constitutional rights of privacy."

The subpoena duces tecum served upon The Second National Bank calls for all the bank records of S. Ray Shelby. Not certain records of the bank as to S. Ray Shelby are subpoened for a certain or definite period, but every transaction he has had with the bank since he has had an account there, even if it should develop that it has been for a period of 25 years or more, is to be produced, investigated, and thrown open to the public.

While the resolution provides for an investigation of the affairs and personnel of the Public Service Commission since 1913, the time the commission was created, yet there is no time limit placed upon the records ordered to be produced by the subpoena duces tecum. What right has the committee to subpoena

the bank records of S. Ray Shelby for the years prior to 1913? If there exists such a thing as privacy in an individual's bank account, then the committee cannot do this. Does privacy exist?

The right to privacy in the conduct of one's personal and private affairs is a right derived from natural law. The origin of this right is thoroughly and admirably discussed by Mr. Justice Cobb of the Supreme Court of Georgia in the case of Pavesich v. New England Life Ins. Co. et al., 122 Ga. 190, 194, 50 S. E. 68, 69:

"The individual surrenders to society many rights and privileges which he would be free to exercise in a state of nature, in exchange for the benefits which he receives as a member of society. But he is not presumed to surrender all those rights, and the public has no more right, without his consent, to invade the domain of those rights which it is necessarily to be presumed he has reserved than he has to violate the valid regulations of the organized government under which he lives. The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence. Any person whose intellect is in a normal condition recognizes at once that as to each individual member of society there are matters private and there are matters public so far as the individual is concerned. Each individual as instinctively resents any encroachment by the public upon his rights which are of a private nature as he does the withdrawal of those of his rights which are of a public nature. A right of privacy in matters purely private is therefore derived from natural law."

The right to privacy in one's affairs is a right guaranteed to all its citizens by the Constitution of the United States and the Constitution of the Commonwealth of Pennsylvania. The fourth amendment to the Constitution of the United States provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, section 8, of the Constitution of the Commonwealth of Pennsylvania provides that:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affrmation subscribed to by the affiant."

In the recent case of United States v. Lefkowitz, 285 U. S. 452, 461, 464, Mr. Justice Butler, discussing the subject of search and seizure, says: " 'whether the articles of personal property opened and the contents examined are numerous or few, the right of personal security, liberty, and private property is violated if the search is general.' . . .

"The Fourth Amendment forbids every search that is unreasonable and is construed liberally to safeguard the right of privacy."

In Boyd v. United States, 116 U. S. 616, 630, 631, Mr. Justice Bradley, speaking for the court and referring to the famous case of Entick v. Carrington, 19 How. St. Tr. 1029, said:

"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of

a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. . . .

". . . . And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

Does the right of privacy extend to an individual's bank records? We are of the opinion that it does.

That the right to privacy extends to an individual's bank records is held in Brex et al. v. Smith et al., 104 N. J. Eq. 386, 146 Atl. 34. In this case a public prosecutor desired to examine all the bank accounts of the members of the Newark Police Department. The court, sitting in equity, issued a restraining order, and did not allow the bank records to be examined. Church, Vice Chancellor, said (pp. 390, 392) : "The question then arises: Are there property rights involved in this application? Can the prosecutor inspect these bank accounts for purposes he declines to disclose? It may be that the relation of a bank to its depositors is that of debtor and creditor, but I think it is more than that. As far as the money actually deposited is concerned, that is true. But as to the records of the accounts, the deposits and withdrawals, that is another matter. There is an implied obligation, as I see it, on the bank, to keep these from scrutiny until compelled by a court of competent jurisdiction to do otherwise. The information contained in the records is certainly a property right. . . .

"The prosecutor also contends that there is no irreparable injury at stake, and that there is a remedy at law. It is quite apparent to me that there is an irreparable injury because it is an attempt to take away a right, of which Mr. Justice Field said in the *In re Pacific Railway Case*, cited above, [32 Fed. 241, 253] 'without the enjoyment of this right [privacy] all other rights would lose half their value.' "

The right of privacy is also recognized in cases where confidential relationship has been established and the disclosure of information obtained thereby is threatened. In Darlington's Estate, 147 Pa. 624, 629, the court, speaking through Mr. Justice Green, said: "The confidential relation is not at all confined to any specific association of the parties to it. While its more frequent illustrations are between persons who are related as trustee and cestui que trust, guardian and ward, attorney and client, parent and child, husband and wife, it embraces partners and copartners, principal and agent, master and servant, physician and patient, and, generally, all persons who are associated by any relation of trust and confidence."

To the same effect are Longenecker v. Zion Evangelical Lutheran Church, 200 Pa. 567; Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464; Vollmer v. Newburger et al., 277 Pa. 282.

In Catlin v. The Savings Bank, 7 Conn. 487, the court held (p. 495) : "An ordinary bank deposit is where a voluntary credit is taken with a bank; and for which no bank note, bill, or similar evidence of debt is given; and for which there exists a right to draw unconditionally. In every such case, a special trust and confidence is reposed in the bank." (Page 495.)

An examination of numerous authorities, not only of our own State, but of other States, convinces us that a confidential relationship exists between a bank and a depositor.

Third: "The Senate Investigating Committee is without authority to issue a subpoena duces tecum."

The resolution passed by the Senate provides: "That said committee shall have power to issue subpoenas under the hand and seal of its chairman, duly attested by the secretary of the Senate, requiring and commanding any person or persons to appear before it . . . and to produce such books, papers, records, and documents as the committee may deem necessary."

The Resolution of the General Assembly of June 13, 1842, P. L. 491, section 1, provides: "That each branch of the legislature shall have the power to issue their subpœna, as heretofore practiced into any part of the Commonwealth, and by attachment to compel the attendance of all persons summoned as witnesses," etc.

Does the power to issue a subpoena include the right to issue a subpoena duces tecum? We are of the opinion that it does. What is meant by the phrase "as heretofore practised"? It appears to have been the practice in Pennsylvania during its early history, where a witness was subpœnaed in an investigation, for him to bring with him books, records, and so forth.

In Davis et al. v. Lehigh Valley R. R. Co., 97 N. J. L. 412, 117 Atl. 716, the same question was decided. The court held: "The grounds are that the statute does not expressly authorize a subpœna *duces tecum* and therefore the justice had no power to make the order. . . . That under this statute a subpoena *duces tecum* might be ordered was adjudged. . . . It is not limited to a subpœna *ad testificandum*, but applies to all witnesses and the production of all papers legally pertinent to the issue about which the witnesses may testify or identify."

In 59 C. J. 99, sec. 83, the author says, in referring to the rights of a legislative committee to compel the production of books and papers: "Where the committee is authorized to issue subpœnas, it may issue subpœnas duces tecum, which the court may not ordinarily set aside or enjoin."

In construing the resolution of 1842, we think that such construction should be given to it as will assist in the due administration of justice.

Fourth: "The power of the Senate Investigating Committee ceased upon the adjournment of the legislature."

The Senate of Pennsylvania is a continuing body, the members of which are elected for a period of 4 years, but are so divided that one half of its members are elected every 2 years.

This very question was raised in the case of McGrain v. Daugherty, supra, and the Supreme Court held (page 181) : "But it cannot well be the same with the Senate, which is a continuing body whose members are elected for a term of six years and so divided into classes that the seats of one-third only become vacant at the end of each Congress, two-thirds always continuing into the next Congress, save as vacancies may occur through death or resignation.

"Mr. Hinds in his collection of precedents says: 'The Senate, as a continuing body, may continue its committees through the recess following the expiration of a Congress'; and, after quoting the above statement from Jefferson's Manual, he says: 'The Senate, however, being a continuing body, gives authority to its committees during the recess after the expiration of a Congress.' "

If the Senate of the United States is a continuing body, it would necessarily follow that the Senate of Pennsylvania is also a continuing body and that its committee would have authority to act during a recess of the legislature.

Fifth: "When a proclamation of the Governor calling a special session of the legislature contains no reference to an investigation, the Senate is without power to order an investigation."

The plaintiff claims that the action of the Senate was in violation of article III, section 25, of the Constitution of the Commonwealth, which is as follows: "When the General Assembly shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the Governor calling such session."

In the Governor's proclamation for a special session of the legislature, there was no mention made of an investigation of the Public Service Commission. Did the failure to do so prevent the Senate from passing the resolution? The answer to this question will depend upon what is meant by "legislation."

"Legislation" has been defined as "the enactment of laws; an act of both bodies comprising the lawmaking power; an act of the legislature." In our opinion the passing of the resolution was an act of the Senate and not "legislation."

In Commonwealth ex rel. v. Griest, 196 Pa. 396, 409, 410, the court held: "The things that are to be done by the two houses are legislative only. . . . The two houses and the governor constitute the entirety of the body which considers and finally determines all matters of legislation."

In Likin's Petition (No. 1), 223 Pa. 456, 460, the court held: "The constitution allows the legislature every power which it does not positively prohibit. . . . The power of construing the constitution devolves upon the judiciary through the manifestation of the political principle that ours is a government of laws, rather than of men. In exercising that power the courts should take a large and comprehensive view of the constitution, ever mindful that every scripture is to be interpreted in the same spirit that gave it forth, and with a deep desire to enforce its full meaning."

In Sweeney v. King, Secretary of the Commonwealth, 289 Pa. 92, Mr. Justice Simpson, speaking for the court, said: "At its special session held in 1926, the legislature adopted a resolution proposing an amendment to article XV of the state Constitution, by adding a new section to it, though the subject-matter thereof was not referred to in the governor's proclamation calling the session. . . . . Plaintiff's only contention is that a resolution for a proposed amendment to the Constitution cannot be adopted at a special session of the legislature, unless the subject-matter thereof is included in the governor's proclamation. The court below did not agree with this, and dismissed the bill. We are in accord with that conclusion.

"The constitutional provision relied on by plaintiff is article III, section 25. . . .We held in Com. v. Griest, 196 Pa. 396, that constitutional amendments are not 'legislation.' As it thus appears that they are among the 'matters left open by the written Constitution' (Likin's Petition No. 1, 223 Pa. 456, 460), the legislature may proceed in relation to them in special or in general sessions, at its discretion: Com. v. Stewart, 286 Pa. 511."

What may be done at a special session of the legislature is thoroughly and ably discussed by Mr. Justice Kephart in the recent case of Comm. ex rel. Schnader v. Liveright, Secretary of Welfare, et al., 308 Pa. 35.

### Conclusions of law

1. The only purpose for which the Senate Investigating Committee could have made an investigation of S. Ray Shelby's bank records was to obtain evidence which would aid it in recommending legislation at the next meeting of the legislature. It does not appear that the bank records of Shelby contain such evidence.

2. The inspection of Shelby's bank records by the committee would be an invasion of his rights as guaranteed to him by the fourth amendment to the Constitution of the United States.

3. The committee was not limited to the right of issuing a subpoena ad testificandum, but also had the right to issue a subpoena duces tecum for the production of papers legally pertinent to any proper inquiry.

4. The committee had the right to continue its investigations after adjournment of the Senate and report at the next meeting of the legislature.

5. At a special session of the legislature, the Senate has the power to appoint an investigating committee, even though the investigation is not mentioned in the Governor's proclamation calling such session.

### Decree

.And now, January 24, 1933, it is ordered adjudged and decreed that The Second National Bank of Uniontown be enjoined and restrained from disclosing to the members of the Senate Investigating Committee, or any of them, or their successors or counsel, any of its records, books, documents, papers, or any other evidence in writing, pertaining to S. Ray Shelby's dealings with said bank.

From Luke H. Frasher, Uniontown, Pa.